[No. S003576. Dec. 18, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ANDREW STOLL et al., Defendants and Appellants.

---

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Monica Knox, Acting State Public Defender, Thomas L. Carroll, Deputy State Public Defender, Laurance S. Smith and Michael R. Snedeker, under appointments by the Supreme Court, Robert Fiedler and John M. Hanley, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jane N. Kirkland, W. Scott Thorpe and Edgar A. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**EAGLESON, J.**—We decide whether a criminal defendant charged with committing lewd and lascivious acts upon a child may introduce a psychologist's opinion testimony, based upon an interview and professional interpretation of standardized written personality tests, that defendant displays no signs of "deviance" or "abnormality." Under existing law and the facts of this case, the evidence bears on a defense claim that the charged acts did not occur. Professional testimony regarding the absence of sexual deviance also is authorized under statutory rules permitting a criminal defendant to introduce evidence of his "good character."

Of course, such evidence must satisfy traditional limits governing the admission of expert testimony—a qualified witness, testifying on an appropriate "subject," and relying upon professionally reasonable "matter." We conclude that a qualified psychologist's diagnosis does not offend such standards solely because it is grounded upon interviews and standardized tests. To the extent the proffered testimony in a particular case is cumulative or unduly prejudicial, the trial court has broad discretion to limit or exclude it.

However, we see no reason to subject this testimony, or the matter upon which it is based, to the special restrictions governing admission of new,

novel, or experimental scientific techniques not previously accepted in the courts. (*Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145]; *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] (hereafter *Kelly/Frye*).) We adhere to settled law viewing this testimony as competent but disputable "expert opinion," rather than new "scientific" evidence that must be proven reliable before it is admitted. Even where a defense expert's diagnosis is based in part on standardized written tests, jurors can be entrusted to consider it with a discriminating eye. Experts have long relied on such tests in forming opinions introduced to raise a reasonable doubt as to a defendant's guilt of charged crimes.

Here, the trial court committed prejudicial error in excluding, on *Kelly/Frye* grounds, expert testimony proffered by the two defendants whose convictions are under review. Insofar as the Court of Appeal's decision upholds these convictions, it will be reversed.

### FACTS

Four defendants—John Stoll, Grant Self, Margie Grafton, and Timothy Palomo—were jointly tried and convicted in the aggregate of thirty-six counts of lewd and lascivious conduct against a total of seven young boys. (Pen. Code, § 288, subd. (a).) The crimes, which encompassed a wide variety of touching made criminal under this section, occurred in Bakersfield, California, between June 1983 and June 1984.

Evidence adduced at trial in late 1984 and early 1985, indicated that defendants sometimes acted together and sometimes acted apart in committing the crimes. Since we granted review only as to defendants Grafton and Palomo, we will focus on evidence offered by and against them.[1] Crimes in which all defendants were found to have participated will be described last.

### A. *Evidence Admitted at Trial*

Defendants Grafton and Palomo were romantically involved and lived together during the pertinent time period. They socialized with the third defendant—Stoll—and his girlfriend, nondefendant Rochelle. Stoll lived with Rochelle in June and July 1983, and then moved into his own house on Center Street. Beginning in March 1984, the fourth defendant—Self—rented a small house behind the swimming pool on Stoll's property. Self knew the other defendants.

---

[1] Stoll did not petition for review. Self's petition was denied.

Five children testified against Grafton: her two sons by an estranged husband, A. and D.; Stoll's son by an ex-wife, J.; Rochelle's son, Chris; and a neighbor boy who lived near Stoll's house on Center Street, Victor. Except for Victor, the same children also testified against Palomo. (The boys' ages at time of trial are stated below.) Stoll sometimes baby-sat Chris, A., and D. during the critical period.

For context, we note that 17 of the 36 counts involved Stoll, who was found to have committed most of them without codefendant participation. Chris testified that he was twice sodomized by Stoll while the latter was living with Chris's mother, Rochelle. J. testified that he was sodomized and/or orally copulated by his father, Stoll, on six different occasions at the Center Street house. Testimony by Grafton's sons, A. and D., also implicated Stoll in a total of three acts of sodomy against these two boys at the same address. Stoll further was found guilty of two separate sexual encounters based upon testimony by neighbor children, Victor (fondling, oral copulation, and sodomy) and Eddie (fondling). (No other defendant was charged with crimes against Eddie.)

We also note that Self was convicted of 10 counts, most of which he was found to have committed on his own. Two convictions were based upon testimony by J. and D., respectively, that Self performed acts of sodomy and oral copulation with them in Stoll's bedroom on Center Street. Self also was found guilty of five separate lewd encounters (digital anal penetration and/or fondling) with a girlfriend's grandson (Jerimy) at other locations. (No other defendant was charged with crimes against Jerimy.)

Defendant Grafton suffered five convictions. One of them (count 9) allegedly was committed by her alone, against Stoll's son, J., who was six years old at trial. J. testified that once, he and Grafton were alone and naked in his father's bedroom on Center Street, and he "rubbed" Grafton's breast.

Grafton also was convicted (count 24), along with Stoll, based on the following testimony by Victor, who was eight years old at trial: while playing with J., A., and "another boy" by the pool at Stoll's house, Victor went inside for a drink. Stoll grabbed Victor, threatened to kill him if he screamed, and took him into the bedroom. Stoll removed both his own and Victor's clothes. Grafton came into the room and took off her clothes. Stoll photographed Victor and Grafton, as well as three other boys. Victor "touched" Grafton's breasts, and orally copulated Stoll. Stoll then told Victor to go home. According to Victor, he returned home and "went to sleep" even though it was still "daytime." At trial, Victor's mother, Mrs. M., confirmed that on two afternoons in May and/or June 1984, Victor

came home "upset" after playing with friends, took a bath, and went to bed without eating dinner—an "unusual" pattern for him.

Only one of defendant Palomo's four convictions (count 25) was found to have been committed without codefendant involvement. As to this count, Grafton's son A., who was nine years old at trial, testified that on one occasion, he and his brother D. were on the couch at home, preparing to go "hunting." Palomo also was present. Palomo placed his hands inside A.'s pants, "fiddled" with A.'s penis, and "rubbed" A.'s rear end.

All four defendants were found guilty of crimes committed against Chris, J., and A., at a group event. (Counts 1, 2, 3.) Although the information also alleged that defendants molested D. at the same time (count 4), the jury did not reach a verdict on that count, and it was ultimately dismissed by the People. (D. was seven, and Chris was eight years old, at time of trial.)

No witness (Chris, J., A., or D.) gave the same account of the group event. They agreed that all defendants and several children were naked together at Stoll's house, but disagreed as to which children were present. Three witnesses (Chris, A., and J.) placed the event in the living room. Two witnesses (Chris and A.) said the children were given Kool-Aid or soda that made them dizzy. As to counts 1 and 3 against Chris and A., respectively, each of these boys testified about sex acts committed against him by one or more defendants.[2] Although J. could not remember whether any adults "touch[ed]" him that day as charged in count 2, Chris and A. testified that unspecified sex acts were committed against J.[3] When D. was asked at trial whether he (count 4), or any other child, was touched that day, he said "no." In addition, three witnesses (J., A., and D.) testified that photographs of defendants and children were taken while they were engaged in sexual activity or, at least, while naked. However, these three boys disagreed as to

---

[2] Chris testified that he was sodomized and orally copulated by Stoll; that he (Chris) sodomized and orally copulated Self; that he (Chris) "sucked" Grafton's breast and "felt" her genitals; and that Chris and Palomo "touched" each other (count 1).

A. testified that Stoll touched his penis, and that he (A.) orally copulated Stoll. A. also said he touched Grafton's breast and "put [his] penis in her private" (count 3).

The jury received standard aiding and abetting instructions. (CALJIC Nos. 3.00, 3.01 (1984 rev.) (4th ed. pocket pt.).)

[3] Chris testified that Stoll did sex "things" with the other children, and specifically "touched" J. A. confirmed that he saw Stoll engage in sexual activity with J., but could not remember what it was (count 2).

the identity of the photographer, and the fourth boy—Chris—remembered no picture-taking at all.[4]

Cross-examination of the same four witnesses revealed inconsistencies in each of their stories. For example, Chris gave conflicting testimony concerning the day on which counts 1 through 3 occurred (i.e., in August 1983, when his mother Rochelle went to Catalina, or on January 14, 1984, when she attended a darts trophy banquet). Chris also said that he told an unspecified "lie" at both the preliminary hearing and on direct examination at trial. Likewise, J., A., and D. admitted that they "lied" at the preliminary hearing when they denied knowing about nude photographs and/or sexual activity between children and adults. J. also disclosed that he had been untruthful at one point during direct examination at trial (i.e., in telling the prosecutor that he did not recall Palomo being in one of apparently two nude photography sessions).

■■■■ The details of the official investigation were elicited on direct and cross-examination of prosecution witnesses, Kern County Deputy Sheriff Ericsson, and child protective services worker, Velda Murillo.[5]

Stoll's ex-wife informed the sheriff's department in mid-June 1984 that J. had mentioned sex acts with A., D., and a male adult.[6] In a home interview, J. told Murillo about sexual activity with A., D., and Self. When asked whether he had engaged in sex with Stoll, J. said, among other things, that he had been sodomized by his father about two weeks earlier. J. also de-

---

[4] J. testified that Self took pictures while the adults and children were naked.

A. testified that Stoll, Grafton, and Palomo took pictures while the "kids and adults [were] naked, doing sex things."

D. testified that Stoll's adult roommates (David and/or Bonny) took pictures while the defendants and children were naked.

As noted, Chris could not recall any picture-taking.

[5] In their closing statements at trial, defendants argued that Murillo used suggestive and coercive interviewing techniques which caused the children to fabricate claims of sexual abuse against defendants.

Grafton and Palomo revive this theme in their briefs in this court. They make repeated references to a document entitled "Report on the Kern County Child Abuse Investigation," which apparently was issued by the Attorney General in September 1986—almost two years after trial in this case ended. Palomo asks that we take judicial notice of this material because it: (1) provides general guidance on "proper investigative techniques in child sex abuse cases, and (2) shows that children in an unspecified Kern County sex abuse investigation were "suggestively interviewed."

We decline Palomo's request. (See Evid. Code, § 459, subds. (a), (b).) The material has no bearing on the limited legal question at hand. And, since it does not refer in any way to these parties, witnesses, or charges, the report adds nothing to the factual record. The facts of this particular investigation were thoroughly explored at trial.

[6] A day or two earlier, Stoll asked the sheriff's department to investigate certain molestation accusations which he claimed had been falsely leveled against him.

scribed nude picture-taking sessions in which Grafton participated. When J. was asked whether he and Grafton had engaged in sexual conduct, his answer was inconsistent with his trial testimony on count 9, insofar as he told Murillo about a wider range of sexual conduct (i.e., he touched Grafton's breasts and genitals, she "kissed" his penis).

Two days later, Ericsson and Murillo placed A. and D. into a county child protection facility. Acting as a team in which Murillo was the lead interviewer, the two investigators had three meetings with A. and two separate meetings with D. over a ten-day period. Most of them took place at the sheriff's office. Each brother was told about J.'s accusations, confirmed that they were true, and described sex acts with Stoll and Self.

For the most part, D. gave "evasive" answers to questions about Grafton's participation in nude photography or sexual activity, telling investigators that Grafton knew about these events but hoped they would stop. In contrast, D. testified at trial on counts 1 through 3, that Grafton was one of the adults who participated in nude group picture-taking.

In his first interview, A. also denied that Grafton had been involved in any nude picture-taking. However, when asked to discuss Grafton in the last interview, A. described the group event in terms similar to his trial testimony on counts 1 through 3. However, although he testified at trial that he vaginally penetrated Grafton, A. told investigators that he and Grafton had engaged in mutual genital-touching. A. also told investigators that Palomo had touched A.'s penis and rear end while the pair were sitting on the couch at home. Unlike his trial testimony on count 25, A. did not disclose that D. was present at the time.

Based in large part on statements made by A., the investigating team interviewed Chris and Victor one time each. Each boy was asked if "some people" had been "touching" him. Chris described sexual encounters with Stoll and Self. Chris also gave investigators an account of the group sex event inconsistent with his trial testimony on counts 1 through 3, insofar as the pretrial version was more generalized as to sexual activity (i.e., the men sodomized the boys) than the trial version.

Similar to his trial testimony, Victor told investigators during a home interview about two encounters—one in which he was sodomized by Stoll, and another involving both Stoll and Grafton. However, as to the second one, Victor described a broader range of sexual conduct with Grafton than the breast-touching described in his trial testimony on count 24 (i.e., telling investigators he "kiss[ed]" Grafton's breasts, and the two of them touched each other's genitals).

Murillo testified that she had a master's degree in marriage, family, and child counseling, had worked six years with child protective services, and

had interviewed over one thousand molestation victims. She explained that they often feel anxiety and guilt, and seldom "volunteer" details of their abuse. Ericsson testified that he had been with the sheriff's department for 15 years, but had received no formal or on-the-job training in child or sex abuse investigations before this case. According to Ericsson, he executed a search warrant at Stoll's house several hours after J.'s interview, but found no photographs. No medical exams were performed on the children, and their interviews were not tape-recorded.

Grafton and Palomo each testified and denied the charges.[7] Grafton showed the jury a large scar on the side of her body that predated the charged crimes, but which Chris and Victor testified did not exist. Grafton further explained that she attended the same darts trophy banquet and Catalina trip attended by Rochelle, on the dates mentioned at trial by Rochelle's son, Chris. Grafton's testimony was corroborated by Rochelle, who was called as a witness during Grafton's case-in-chief. However, Rochelle (like Chris) indicated that there were other occasions on which both Stoll and Grafton had baby-sat Chris.

During Stoll's case-in-chief, Dr. Roger M. Mitchell, a psychologist, testified at length as an expert on "protocols" commonly used by the psychological community for minimizing the traumatic effect of the investigation upon child sex abuse victims, and decreasing the likelihood that interviewees will distort facts. Such guidelines assertedly call for a comfortable environment (e.g., a therapist's office or the child's home), and a carefully balanced number of interviews (e.g., "three or four") so that the interviewer can begin to see patterns without appearing too demanding or coercive.[8] Dr. Mitchell stated that it is "somewhat appropriate" to ask children "leading questions," but did not define that concept.

B. *Excluded Testimony of Defense Psychologist*

Grafton called Dr. Mitchell in her case-in-chief. The prosecutor successfully requested an offer of proof on the nature of the proposed testimony. Outside the jury's presence, Grafton's counsel explained that, based upon professional experience, interviews, and the administration of certain psychological tests, Dr. Mitchell would give an expert opinion as to whether Grafton possesses any "pathology" in the nature of "sexual deviation." Counsel insisted that the testimony was admissible as "character evidence," because it tended to show that Grafton has no predisposition to commit

---

[7] Stoll also took the stand and denied all charges. Self did not testify. He relied on an alibi provided by his brother, covering three dates upon which some of the victims seemed to place some of the crimes. The court found true an allegation that Self had committed a prior serious felony (Pen. Code, § 288a, subd. (c)) within the meaning of Penal Code section 667.

[8] Dr. Mitchell suggested that the preferred practice is to tape-record interviews, primarily because it minimizes the need for repeated interviews that could traumatize the child.

lewd or incestuous acts. (Citing Cal. Const., art. I, § 28, subd. (d); Evid. Code, § 1102; all further unlabeled statutory references are to the Evidence Code.)

Relying on *Kelly, supra,* 17 Cal.3d 24, and *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], the prosecutor essentially replied that a defendant must first show that a psychological "profile" of a child molester exists, and that its absence in a particular person is generally accepted by other experts to mean that the person has not molested children. Defense counsel countered that the proffered testimony need only meet, and did meet, the requirements for expert opinion testimony set forth in section 801, subdivisions (a) and (b), i.e., it would "assist" the trier of fact, and was based on "matter" upon which experts may "reasonably rel[y]." Defense counsel cited the pre-Evidence Code case of *People* v. *Jones* (1954) 42 Cal.2d 219 [266 P.2d 38], for the proposition that expert opinion that a defendant displays no signs of sexual deviance is admissible as character evidence in a Penal Code section 288 prosecution.

The trial court ruled that a *Kelly/Frye* "reliability" showing of an unspecified nature must be made before the jury would be allowed to hear Dr. Mitchell's testimony. In the ensuing hearing under section 402, subdivision (b),[9] Dr. Mitchell first listed his expert qualifications—an issue which has never been in serious dispute.[10]

Grafton's counsel then elicited the following testimony on direct voir dire examination: approximately one week earlier, Grafton was administered two "standardized" measures of "personality function," the Minnesota Multiphasic Personality Inventory (MMPI), and the Millon Clinical Multiaxial Inventory (MCMI). The MMPI—the "primary" test—was copyrighted in 1943 and, following several revisions, is still "the most widely used psychological test" on both a local and national level.

Dr. Mitchell continued: the MMPI is "always" used by psychiatrists and psychologists to diagnose patients at various stages of clinical treatment. It

---

[9] Section 402, subdivision (b) provides that when the existence of a "preliminary fact" is in dispute, the trial court "may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ."

[10] Dr. Mitchell testified on direct voir dire examination that he has a Ph.D., is licensed to practice in clinical psychology, and had been in private practice in Bakersfield for about six years preceding trial. He basically described himself as a specialist in performing psychological examinations of parties in various "legal matters," including defendants and victims in "rape" and "child molestation" prosecutions. Although the precise nature and number of such matters is not clear from the record, Dr. Mitchell stated that he "frequently" qualifies as an "expert psychologist" in Kern County Superior Court. Dr. Mitchell estimated that he is "involved in the court process probably once a week, [or] maybe once every two weeks . . . ." Dr. Mitchell stated that he regularly, and indeed "daily," relies in his practice on the methods used here (i.e., administration and interpretation of certain psychological tests, and personal interviews).

also is "frequently" given in "employment [and] re-employment situations in conjunction with [a] polygraph," and in "promotion studies in the industry," as well as to inmates and job applicants in correctional facilities.

According to Dr. Mitchell, the basic test measures 10 "general possibilities for abnormality in psychological function."[11] It consists of 566 questions on a wide variety of subjects, each calling for a "true or false" answer. The first question is, "I like Mechanics Magazine." Dr. Mitchell further explained that the MMPI has several built-in "validity scales" which determine the extent to which the test is accurately measuring the traits it purports to measure. These scales, he said, help detect whether the taker is attempting to "lie" or appear in a falsely "virtuous" light.

Dr. Mitchell indicated that the test probably has a "competence level of point nine" for "normal" persons, whereas the "usual" standard in psychological testing is "point seven and above." Dr. Mitchell agreed with counsel's "lay" assessment that the test has better than a "70 percent chance of being right" in such circumstances. However, the witness also acknowledged that the test is "completely invalid" when given to "disturbed" or "psychotic" individuals. One of Dr. Mitchell's patients, an "admitted" child molester, had tested "within normal limits" on the MMPI.

Dr. Mitchell described the MCMI on direct examination as follows: it was copyrighted in 1976, and had achieved "widespread acceptance" in the three or four years preceding trial. It is widely used in Kern County, but less frequently at the national level. It "overlaps the MMPI in diagnosing degree of general psychopathology," and is designed to identify symptoms "in the format of the D.S.M. III [American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Third Edition]."[12] His reading of the MCMI manual and unspecified studies showed validity and reliability to be "quite high and within accepted standards."

■■ ■ ■ After reviewing Grafton's test results, Dr. Mitchell interviewed her for two hours in jail, discussing the charges against all

---

[11] Dr. Mitchell listed these areas of abnormality as "hysterical adjustment, problems of depression, . . . abnormality in bodily function, . . . indications of sociopathy or psychopathy, indications of abnormal gender development or identification, . . . abnormality in thinking processes, in adjustment to levels of anxiety and reality testing and degree of impulsivity or hypomanic difficulties and . . . social withdrawal."

[12] According to Dr. Mitchell, such diagnostic categories include the degree to which a person is "asocial or schizoid or withdrawn," or "avoidant of contact with others." The MCMI also assertedly measures dependency or submission, gregariousness or histrionic development, narcissism, antisocial behavior, compulsive or conforming trends, and passive/aggressive or negativistic traits. Other categories include personality disorder on a pathological scale, and immediate clinical presentation of the individual.

defendants. Based on his *"individual interpretation"* of the test and interview results, Dr. Mitchell was of the *"professional opinion"* that Grafton "has a *normal personality function,* likely has [had] throughout her lifetime, and . . . is falsely charged[13] in this matter." (Italics added.) He immediately clarified this last phrase to mean that Grafton has "[*not*] *engaged in the past in sexual deviancy* of any kind . . . [and] shows *no indications of deviancy in any other personality function. . . . Especially* [*in light of*] *a low indication for antisocial or aggressive behavior,* I must conclude that it is *unlikely . . . she would be involved in the events she's been charged with.*" (Italics added.) He added that his opinion was based also on the results of similar examinations of Palomo, and his knowledge of the Grafton-Palomo relationship.

On cross-examination by the prosecutor, Dr. Mitchell testified: neither he nor other qualified experts use the two tests as a "lie detector" to reach an absolute determination as to whether an individual is guilty of charged crimes. Rather, his opinion of Grafton was based upon a *"diagnostic process"* combining *"many, many pieces of data,"* including professional experience with other individuals in similar situations, knowledge of Grafton's and Palomo's test results, knowledge about the charges against them, and his personal assessments of them. (Italics added.) Dr. Mitchell said his examination of Grafton was "extensive," such that the MMPI and MCMI were *"not by any means the sole determinor"* of his opinion. (Italics added.) Rather, it reflects, in many respects, a *"subjective judgment"* that is not based on *"an absolute cut and dried scientific approach."* (Italics added.)

The prosecutor then asked whether there are any studies in which "known guilty people have been given the MMPI test . . . in a child molest case, and their profile as a child molester appears on the . . . test." Dr. Mitchell replied that "there are studies which relate to general trends and characteristics of individuals with sexual deviancy, and their typical manner of scoring on this measure." Although he did not identify these studies by name, he was certain that most of them involved convicted offenders.

Dr. Mitchell identified one MMPI measure of antisocial adjustment, the "psychopathic deviant" scale, as being "commonly elevated" in "criminal

---

[13] A psychologist, called to testify as an expert on the existence of certain personality traits and likelihood of certain behavior, is generally not competent to testify as to the "truth" or "falsity" of criminal charges. Although opinion testimony is not made inadmissible solely because "it embraces the ultimate issue to be decided by the trier of fact" (§ 805), an expert giving such an opinion must be otherwise qualified to do so. (See § 720.) Here, of course, nothing in the voir dire testimony suggested that Dr. Mitchell was qualified to render a legal opinion as to whether all elements of the charged crimes could be proven beyond a reasonable doubt against Grafton and Palomo. However, since Dr. Mitchell immediately retracted his assessment of the charges, we need not explore this issue further.

populations" and "in sexual deviancy cases and problems." He also said that persons "charged with molest[ation] are depressed because of their jail circumstance." When asked whether he was aware of any studies linking known child abusers to "normal" test results, Dr. Mitchell answered, "no."

Upon further questioning by the prosecutor, Dr. Mitchell stated that many studies had been conducted on factors influencing the "reliability" of both tests. That term, he said, refers to the extent to which test results will be repeated if the same person takes the test again under similar circumstances. According to Dr. Mitchell, countless unspecified studies indicate that persons "under extreme psychological stress do not score reliably on the MMPI."

Because Grafton "self-administered" the test in jail, Dr. Mitchell could not answer prosecution questions about her testing environment (e.g., timing of exam and possible consultation with others). When asked whether "accepted medical procedure" required him to personally monitor test administration, Dr. Mitchell simply said it "depends upon the circumstances."

When the prosecutor asked whether the scientific community generally accepts the MMPI as a valid measure of psychopathology, Dr. Mitchell said, "yes, by all means it does." The prosecutor's attempts to discern the scope of Dr. Mitchell's knowledge in this regard were inconclusive.[14]

At one point during cross-examination, defense counsel objected when the prosecutor characterized Dr. Mitchell as having testified that Grafton "did not fit within the profile of a child molester." The court overruled the objection. Dr. Mitchell corrected the prosecutor's characterization, saying his actual opinion was that Grafton showed no *possibility for sexual deviancy in her personality profile.* (Italics added.)

Following redirect examination and further argument by both counsel, the trial court excluded the proffered testimony. Adopting the prosecutor's

---

[14]For example, the prosecutor asked if Dr. Mitchell was aware of one study giving the MMPI a 70 percent validity rating. Defense counsel objected that no foundation had been laid (see § 721, subd. (b)), but was effectively overruled. Dr. Mitchell responded that the named study was not only "outdated," but that the prosecutor had recited its findings "out of context." Dr. Mitchell was aware of a "developing body of opinion" that MMPI results might not disclose that an individual was a "situational," as opposed to "chronic," child molester. As on direct examination, Dr. Mitchell was aware of, but did not name, studies which had identified certain general characteristics in convicted child molesters. However, he had no knowledge of several other studies named, but not described, by the prosecutor. At one point during this exchange, defense counsel renewed his foundation objection. The court instructed defense counsel to defer any concerns until redirect examination.

terminology, the court reasoned that the defense had not met its burden under *Kelly, supra,* 17 Cal.3d 24, of establishing that a profile of a child molester is generally accepted in the scientific community, or that a person who does not fit the profile has not actually molested children.

Grafton's counsel immediately urged the court to reconsider on grounds that Dr. Mitchell did not refer to, or rely upon, any "profile." Counsel also insisted that if Dr. Mitchell were allowed to testify, he would eliminate all reference to the truth or falsity of the charges and focus only on the lack of "sexual deviation." The court denied Grafton's request.

Palomo's counsel then stated that he too intended to call Dr. Mitchell for the purpose of testifying that Palomo had tested "within the range of normal heterosexuality." The court refused to allow the testimony on grounds that its exclusionary ruling applied to Palomo as well.

## C. *Verdict and Appeal*

As noted, the jury entered guilty verdicts against Crafton on five counts (1, 2, 3, 9, 24), and against Palomo on four counts (1, 2, 3, 25).[15] In a consolidated appeal, the Court of Appeal affirmed the judgment as to all defendants in three separate opinions. Justice Martin's lead opinion concluded that the proffered testimony failed the *Kelly/Frye* test, because the MMPI and MCMI were not shown to have been generally accepted as accurate personality measures, or properly administered in this case. Justice Martin further observed that even if lack of deviance qualified as "good character" evidence, the tests were not the type of material upon which an expert can reasonably rely to make this assessment.

Concurring in the judgment, Justice Best agreed with the dissent that the proffered opinion had been erroneously excluded under *Kelly/Frye.* However, he found that a more favorable defense verdict was not reasonably probable under *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. Presiding Justice Franson dissented on grounds that *Kelly/Frye* has never been applied to expert opinion offered to prove mental or psychological state, citing *People* v. *McDonald* (1984) 37 Cal.3d 351, 372-373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]. Since the defense centered on "personal denials," the dissent found that exclusion of this relevant character evidence was prejudicial under the *Watson* standard.

---

[15] Each defendant was represented by his or her own counsel at trial and on appeal. Stoll received a 40-year state prison term. Self received a 31-year term. Grafton received a 16-year term. Palomo received a 14-year term.

■ ■ ■ ■  Discussion[16]

The Attorney General argues that Dr. Mitchell's use of tests and an asserted "profile" constitutes a new scientific technique subject to *Kelly/Frye*. He insists that defendants have failed to show that this technique is generally accepted in the psychiatric or psychological community for the purpose offered here—to uncover personality traits that are linked to non-commission of the charged criminal acts.

Grafton and Palomo insist that a close reading of this record reveals that testimony on only one narrow trait was offered. Referring variously to that trait as lack of sexual deviance, homosexuality, incestuous desires, or pedophilia, defendants argue that expert opinion as to its existence has always been admissible, without reference to *Kelly/Frye,* to show that a defendant is not likely to commit criminal sexual misconduct. As we will discuss, defendants provide a more accurate picture of the law and facts.

■ At the outset, defendants' claim that the testimony is relevant character evidence must be sustained. (§§ 210, 1102.) In *People* v. *Jones, supra,* 42 Cal.2d 219, 222, we found prejudicial error in the exclusion of expert opinion, testimony that defendant is "not a sexual deviate" where offered to prove that he did not commit lewd and lascivious acts upon a child. *Jones* noted that certain now-repealed Welfare and Institutions Code sections assumed a logical connection between conviction under Penal Code section 288 and subsequent psychiatric diagnosis as a "sexual psychopath." (42 Cal.2d at p. 224.) *Jones* concluded that the opposite inference is also reasonable, i.e., *absence* of such a "disposition" tends to prove that defendant has *not* committed the crime. (*Id.* at pp. 224-225.)

---

[16]We note that article I, section 28, subdivision (d), of the California Constitution (section 28(d)) states, inter alia, that "relevant evidence shall not be excluded in any criminal proceeding," but that "[n]othing in this section shall affect . . . Evidence Code, Section[ ] . . . 1103." Section 28(d) was intended to repeal "both judicially created and statutory rules *restricting* admission of relevant evidence in criminal cases . . . except insofar as [it] expressly preserves them . . . ." (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1082 [255 Cal.Rptr. 352, 767 P.2d 619], italics added.) *Harris* stated, in dictum, that section 28(d)'s reference to Evidence Code section 1103 (permitting and restricting admission of certain character evidence of a crime victim) "by implication may have preserved" the rule in section 1101 (restricting character evidence to prove disposition). (47 Cal.3d at p. 1081.)

We need not decide whether section 28(d) affected the *Kelly/Frye* rule, or the pertinent Evidence Code sections (§§ 210, 801, 1102.) Section 28(d) has no effect on the outcome of this case because, as discussed in the opinion, the type of professional testimony proffered here has always been *admissible* under these authorities. The parties and lower courts have assumed that these prior rules remain intact in the wake of section 28(d).

Section 1102 allows an accused to present expert opinion testimony of this kind to indicate his nondisposition to commit a charged sex offense.[17] This section was enacted in 1965, *after People* v. *Jones, supra,* 42 Cal.2d 219, was decided. (Stats. 1965, ch. 299, § 2, p. 1336.) As the accompanying Law Revision Commission comment makes clear, the statute codified *Jones*'s rule permitting introduction of defense expert opinion of "good character" to show noncommission of charged crimes. (29B West's Ann. Evid. Code (1966 ed.) § 1102, pp. 12-13; Deering's Ann. Evid. Code (1986 ed.) § 1102, pp. 293-295.) The Legislature thus implicitly endorsed "lack of deviance" as a relevant character trait in a lewd and lascivious conduct case, even though the "sexual psychopathy" provisions cited in *Jones* were overhauled in the same, as well as prior, years. (See, e.g., former Welf. & Inst. Code, § 5501, amended by Stats. 1963, ch. 1913, § 5, p. 3907, repealed by Stats. 1965, ch. 391, § 3, p. 1630, replaced by Stats. 1965, ch. 391, § 5, p. 1643 [mentally disordered sex offender (MDSO) provisions; later revised and repealed].)[18]

Contrary to the Attorney General's reading of this record, Dr. Mitchell indicated that no psychological "profile" entered into his diagnosis. (See p. 1161, fn. 22, *post*.) Rather, much as in *People* v. *Jones, supra,* 42 Cal.2d 219, the proffered opinion was that Grafton (and presumably Palomo) displays a "normal personality function," and shows no "indications of deviancy." Dr. Mitchell's emphasis on "low indication for antisocial or aggressive behavior" implied that Grafton is "unlikely" to commit the charged acts or any serious crime. This link between personality and behavior is buttressed by Dr. Mitchell's suggestion that such diagnoses are routinely used in many contexts to determine whether troublesome behavior has occurred in the past or may occur in the future. The trier of fact is free to decide the weight, *if any,* to afford this opinion. However, we cannot say as a matter of law that it has *no* logical bearing on the defense case.

■ We also agree with defendants that the proffered evidence satisfies limits placed by section 801, subdivision (a), on all expert opinion testimo-

---

[17]Section 1102 provides: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character[;] [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (See also 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) §§ 33.1, 33.4, pp. 1174-1175, 1180-1188.)

[18]In *People* v. *John W.* (1986) 185 Cal.App.3d 801, 806-808 [229 Cal.Rptr. 783], the court suggested that repeal of the sexual psychopathy and MDSO schemes undercut *People* v. *Jones, supra,* 42 Cal.2d 219, insofar as *Jones* authorizes admission of defense expert opinion on lack of deviance. However, the *John W.* court overlooked codification of the character evidence rule in section 1102. To the extent *John W.* is inconsistent with our opinion on this point, it is disapproved.

ny. That subdivision requires that such testimony be "[r]elated to a subject that is *sufficiently beyond common experience* that the opinion of an expert would *assist* the trier of fact." (Italics added.) We have interpreted this language to require exclusion of expert opinion *"only* when it would add *nothing at all* to the jury's common fund of information . . . ." (*People* v. *McDonald, supra,* 37 Cal.3d at p. 367, italics added.) Here, testimony by the alleged victims implicated Grafton and Palomo in homosexual or incestuous acts with children, including participation in at least one adult-child group sex encounter. Since the jury could not otherwise have been aware of personality traits inconsistent with such misconduct, Dr. Mitchell's testimony had potential to "assist" the jury on a pertinent point.

■ The proffered testimony also does not offend section 801, subdivision (b), simply because it was based, in part, upon standardized written personality tests and patient interviews. This subdivision requires that expert opinion testimony be "[b]ased on matter" (including knowledge, experience, and education) "perceived by or personally known to the witness or made known to him at or before the hearing, *whether or not admissible, that is of a type that reasonably may be relied upon by an expert* in forming an opinion upon the subject to which his testimony relates," except as otherwise "precluded by law." (Italics added.)

No precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior. In effect, however, California courts have deferred to a qualified expert's decision to rely on "standardized" psychological tests such as the MMPI to reach an opinion on mental state at the time acts were committed. (See *People* v. *Coleman* (1985) 38 Cal.3d 69, 78-81 [211 Cal.Rptr. 102, 695 P.2d 189] [MMPI and Rorschach Test]; *People* v. *Cruz* (1980) 26 Cal.3d 233, 248 [162 Cal.Rptr. 1, 605 P.2d 830] ["standard tests"]; *People* v. *Coogler* (1969) 71 Cal.2d 153, 165 [77 Cal.Rptr. 790, 454 P.2d 686] [MMPI and Rorschach Test]; *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 275 [169 Cal.Rptr. 497] [MMPI]; *People* v. *Phillips* (1979) 90 Cal.App.3d 356, 360 [153 Cal.Rptr. 359] [MMPI and achievement/intelligence tests]; *People* v. *Cox* (1978) 82 Cal.App.3d 221, 223 [147 Cal.Rptr. 73] [MMPI]; *People* v. *Humphrey* (1975) 45 Cal.App.3d 32, 35 [119 Cal.Rptr. 74] [MMPI].) Such deference is no less appropriate here. Indeed, voir dire testimony indicated that qualified professionals routinely use raw material from the MMPI and MCMI as a basis for assessing personality, and drawing behavioral conclusions therefrom.[19]

---

[19] During voir dire in this case, the prosecutor attempted to discern whether Grafton's "self-administration" of the two tests followed "accepted medical procedure." Since Dr. Mitchell never indicated whether any set "procedure" exists, we cannot determine whether this factor alone made his reliance on Grafton's test results professionally "unreasonable"

To the same end, Dr. Mitchell was entitled to base his opinion on observations of, and statements made by, the patient during a routine psychological interview. (See *People* v. *Santa Cruz, supra,* 26 Cal.3d at p. 248; *People* v. *Coogler, supra,* 71 Cal.2d at p. 164.) Of course, *any* expert may be cross-examined at trial as to the material and reasoning underlying his opinion. (§ 721, subd. (a).) ■ Admission of expert opinion into evidence does not preclude the trier of fact from "reject[ing] the expert's conclusions because of doubt as to the material upon which [they] were based." (*Coogler, supra,* at p. 166.)

■ The Attorney General argues that even if the proffered testimony satisfies the foregoing authorities, it also must meet California's version of the rule first announced in *Frye, supra,* 293 Fed. 1013 (hereafter *Frye* test), for the admissibility of "new scientific technique[s]." (*Kelly, supra,* 17 Cal.3d 24, 30.) We disagree.

■ The hallmark of the *Kelly/Frye* rule, and the point emphasized by the Attorney General here, is that the proponent must establish, "usually by expert testimony," that the technique is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " (*Kelly, supra,* 17 Cal.3d at p. 30, quoting *Frye, supra,* 293 Fed. at p. 1014, italics omitted.) The proponent also must establish that "the witness furnishing such testimony" is "properly qualified as an expert to give [such] an opinion." (17 Cal.3d at p. 30, italics omitted.) The third and final requirement, which the Attorney General also suggests was not met here, is for the proponent to show that "correct scientific procedures were used in the particular case." (*Ibid.*)

While the standards imposed by the *Kelly/Frye* rule are clear, the definition of a "new scientific technique" is not. In *Kelly, supra,* 17 Cal.3d at pages 29-30, for example, the parties did not dispute that the *Frye* test applied to an identification process in which an expert analyst compares "voiceprints," or graphs of human voices, produced by a "spectrograph" machine. Because the inventions and discoveries which could be considered "scientific" have become virtually limitless in the near-70 years since *Frye* was decided, application of its principle has often been determined by reference to its narrow "common sense" purpose, i.e., to protect the jury from

---

under section 801, subdivision (b). Assuming such a foundational problem could be established in a case such as this, the trial court "may, and upon objection shall, exclude [opinion] testimony" that is based *"in whole or in significant part"* on "improper" matter. (§ 803, italics added.) Where, however, the trial court determines as a matter of law that the opinion is sufficiently supported by other appropriate matter, the witness may be allowed to "state his opinion after excluding from consideration the matter determined to be improper." (*Ibid.*; see also 2 Jefferson, Cal. Evidence Benchbook, *supra,* § 29.5, pp. 1027-1029.)

techniques which, though "new," novel, or " 'experimental,' " convey a " 'misleading aura of certainty.' " (*Kelly, supra,* at pp. 30-32, citation omitted; see, also *People* v. *McDonald, supra,* 37 Cal.3d at pp. 372-373.)

This approach has produced two discernible themes. First, *Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law. The courts are willing to forego admission of such techniques completely until reasonably certain that the pertinent scientific community no longer views them as experimental or of dubious validity. This all-or-nothing approach was adopted in full recognition that there would be a " 'considerable lag' " between scientific advances and their admission as evidence in a court proceeding. (*Kelly, supra,* 17 Cal.3d at p. 31, citation omitted.)

The second theme in cases applying *Kelly/Frye* is that the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible. (See e.g., *People* v. *Coleman* (1988) 46 Cal.3d 749, 774-775 [251 Cal.Rptr. 83, 759 P.2d 1260] ["hemostick" method of presumptive testing for presence of blood]; *People* v. *Brown* (1985) 40 Cal.3d 512, 528-535 [220 Cal.Rptr. 637, 709 P.2d 440] [electrophoretic testing of body fluid and blood stains to identify donor]; see also *People* v. *Shirley* (1982) 31 Cal.3d 18, 51-52 [181 Cal.Rptr. 243, 723 P.2d 1354] [listing cases which have applied the *Frye* test to polygraph examinations, "truth serum," Nalline testing, human bite marks, and microscopic identification of gunshot residue particles].)

*Kelly/Frye* also has been applied to less tangible new procedures which carry an equally undeserved aura of certainty. In *People* v. *Shirley, supra,* 31 Cal.3d at page 66, we applied the *Kelly/Frye* rule to, and barred admission of, "post-hypnotic" testimony of a rape complainant. We explicitly rejected the Attorney General's claim in that case that the *Kelly/Frye* rule was limited to techniques analyzing "physical evidence." (*Id.* at p. 52.) We noted that, given the rule's prophylactic purpose, nothing precludes its application to "a new scientific process operating on purely psychological evidence." (*Id.* at p. 53.) As thoroughly explained in Justice Mosk's majority opinion, the danger of hypnotically refreshed testimony lies in the tendency of the process to "actively contribute[ ] to the formation of pseudomemories, to the witness' abiding belief in their veracity, and to the inability of the witness (or anyone else) to distinguish between the two." (*Id.* at p. 53.)

However, absent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly/Frye*. This distinction was recently confirmed in our unanimous decision in *People v. McDonald, supra,* 37 Cal.3d 351. There we found prejudicial error in the exclusion of defense expert testimony on the psychological factors undermining the accuracy of eyewitness identification. In dispensing with any need for a *Kelly/Frye* showing in that case, Justice Mosk noted that "[w]hen a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. . . . [¶] . . . We have never applied the *Kelly/Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association (*People v. Phillips* (1981) 122 Cal.App.3d 69, 86-87 [175 Cal.Rptr. 703] ('Munchausen's syndrome by proxy'))." (*McDonald, supra,* 37 Cal.3d at pp. 372-373.)

■■ The psychological testimony proffered here raises none of the concerns addressed by *Kelly/Frye*. The methods employed are *not* new to psychology or the law, and they carry no misleading aura of scientific infallibility.

California courts have routinely admitted defense expert opinion analogous to the one offered here, with no suggestion that *Kelly/Frye* applies. In some of these cases, expert testimony of defendant's personality was admitted to prove that defendant was not likely to commit certain acts in the future. (See, e.g., *People v. Burnick* (1975) 14 Cal.3d 306, 312 [121 Cal.Rptr. 488, 535 P.2d 352] [MDSO proceeding: defendant is not "homosexual" or "pedophilic" but is depressed, "highly immature," and " 'predominately heterosexual' "]; *People v. Monroe* (1985) 168 Cal.App.3d 1205, 1214 [215 Cal.Rptr. 51] [proceeding to challenge registration as sex offender: defendant is not " 'dangerous' " or " 'sexual[ly] deviant' "].)

In other cases, the testimony was introduced as circumstantial evidence that the defendant did not harbor the requisite criminal intent or mental state at the time he committed the charged act. (See, e.g., *People v. Robbins* (1988) 45 Cal.3d 867, 874 [248 Cal.Rptr. 172, 755 P.2d 355] [guilt phase/capital trial: defendant with " 'primary diagnosis' " of "pedophilia" unintentionally murdered uncooperative molestation victim during "unthinking rage"]; *People v. Hendricks* (1988) 44 Cal.3d 635, 641 [244 Cal.Rptr. 181, 749 P.2d 836] [penalty phase/capital trial: defendant murdered in fit of " 'homosexual rage' "]; *People v. Memro* (1985) 38 Cal.3d

658, 693 [214 Cal.Rptr. 832, 700 P.2d 446] [guilt phase/capital trial: defendant has no "psychosis or organic brain syndrome" but suffers from a "severe personality disorder," i.e., he is a "homosexual pedophile" who murdered during a "fit" or "rage"]; *People v. Rosenkrantz* (1988) 198 Cal.App.3d 1187, 1198 [244 Cal.Rptr. 403] [noncapital murder trial: defendant's reasoning process obscured by severe "adjustment disorder with mixed emotional feature," certain "stress" reactions, and/or "Egodystonic homosexuality"]; but see Pen. Code, § 29, as added by Stats. 1984, ch. 1433, § 3, p. 5030.)

Moreover, as Dr. Mitchell testified, diagnostic use of written personality inventories such as the MMPI and MCMI has been established for decades. Modern courts have not resisted reference to these tests. As already noted, defense expert opinion on an impressive range of psychiatric diagnoses has been admitted without reference to *Kelly/Frye* where the expert made known at trial that he relied, in part, on the MMPI or analogous tests. (See, e.g., *People v. Coleman, supra,* 38 Cal.3d at p. 78 [defendant is subject to " 'psychotic decompensation,' " or " 'break-down[s] involving gross distortion' " in " 'interacting with the world, behaving, [and] mood' "]; *People v. Coogler, supra,* 71 Cal.2d at p. 165 [defendant is a "borderline schizophrenic" who "under stress may become psychotic"].)

We see no reason to depart from this settled approach. As discussed, criminal defendants are authorized to use character evidence, including expert opinion, to prove *"conduct* in conformity." (§ 1102, italics added.) This principle applies where lack of deviance is offered as circumstantial evidence that a defendant is unlikely to have committed charged acts of molestation. (*People v. Jones, supra,* 42 Cal.2d at pp. 224-225.)

Contrary to the dissent's claim, expert reliance on the MMPI and MCMI for this particular purpose is *not* a "revolutionary" development. (Dis. opn., *post,* p. 1167.) As the dissent concedes, standardized personality tests previously have been used in forming expert opinion admitted to show that an accused did not harbor the requisite *"mental state* at the time the alleged acts were committed." (Dis. opn., *post,* p. 1167, italics added.) Here, defendants offered similar expert testimony to suggest that they did not commit the requisite *act.* In either case, the fundamental purpose of the testimony is the same—to raise a reasonable doubt as to guilt of charged crimes. The dissent offers no legal or logical basis for conditioning application of the *Kelly/Frye* rule upon the particular *theory* by which the accused seeks "to exclude [himself] from the relevant class of offenders." (Dis. opn., *post,* p. 1167, original italics omitted.) It would be anomalous to view the MMPI and similar tests as a "new" technique at this late date.

We also are persuaded that no reasonable juror would mistake an expert's reliance on standardized tests as a source of infallible "truth" on issues of personality, predisposition, or criminal guilt. Here, for example, Dr. Mitchell stated that the MMPI was essentially 70 percent accurate in diagnosing some patients, but "completely invalid" as to others. Although the witness expressed faith in his own methods, he recounted one instance in which an "admitted" child sex offender had tested "normal" on the MMPI. Thus, despite testimony regarding "validity scales," the test results—which were never actually described below—were not made to appear "foolproof." (Dis. opn., *post*, p. 1168.)

More importantly, the MMPI and MCMI are obviously a springboard for a far more normative and subjective diagnostic process. That this process is a learned professional *art,* rather than the purported exact "science" with which *Kelly/Frye* is concerned, is well illustrated by the witness's guarded testimony here. Dr. Mitchell left no doubt that he relied heavily upon patient interviews, case history, and past experience in forming his educated, but debatable, opinion.

Along these lines, we reiterate that issues of test reliability and validity may be thoroughly explored on cross-examination at trial. (See § 721, subd. (a).) The prosecution also may call, in rebuttal, another expert of comparable background to challenge defense expert methods. (See, e.g., *People* v. *Rosenkrantz, supra,* 198 Cal.App.3d at p. 1199.) Even the dissent acknowledges cases in which the test-based opinion of the defendant's expert was *admitted into evidence,* and then rebutted by the prosecution's expert. (*People* v. *Coleman, supra,* 38 Cal.3d at pp. 78-81; *People* v. *Cruz, supra,* 26 Cal.3d at pp. 247-248.)[20] Contrary to the dissent's suggestion, we find no California case in which an attempt to introduce similar defense evidence was rebuffed.[21]

---

[20] The dissent is concerned that allowing the defense to present rebuttable test-based expert character evidence in criminal cases will lead to time-consuming "mini-trials" tangential to the issue of guilt or innocence. (Dis. opn., *post,* p. 1169.) However, as we have seen, such defense evidence has *long been admissible* as *pertinent* to guilt or innocence. Moreover, the dissent's proposal that foundational standardized personality tests be subject to *Kelly/Frye* will not solve the "mini-trial" problem it foresees. As the dissent concedes, even if tests like the MMPI and MCMI were unable to survive *Kelly/Frye* scrutiny, defense experts would still be free to state their diagnostic opinions insofar as based on other "reasonable" foundations, and the prosecution would still have the opportunity for pertinent rebuttal. In any case, of course, the trial court has broad discretion to limit the number of competing experts, or to exclude cumulative or confusing expert testimony altogether. (§ 352.)

[21] The dissent suggests that the court in *People* v. *John W., supra,* 185 Cal.App.3d at pages 803-806, upheld exclusion of defense expert opinion on grounds that the expert relied upon the MMPI, and that this procedure is a "new" and "unreliable" technique under *Kelly/Frye.* (See dis. opn., *post,* p. 1168.) Such is not the case. Rather, there were three components of the psychologist's examination of the defendant in *John W.*: (1) an interview; (2) administration

The Attorney General nonetheless insists that the proffered testimony is inadmissible under *People* v. *Bledsoe, supra,* 36 Cal.3d 236. However, that case is not controlling.

*Bledsoe* involved a rape prosecution in which the victim and defendant gave conflicting testimony on the issue of consent. In the prosecution's case-in-chief, the victim's rape counselor testified that, in her expert opinion, the victim had been suffering from "rape trauma syndrome." (36 Cal.3d at pp. 243-244.) The counselor described the concept as an " 'acute stress reaction to the threat of being killed' "; it often progressed in three phases encompassing such varied behavior as agitation, fear, masked feelings, acting as though nothing has happened, looking normal to others, and depression. (*Id.* at pp. 242-243.) Defendant objected at trial on "relevance" grounds. (*Id.* at p. 241.) On appeal, the parties debated whether the evidence satisfied the *Kelly/Frye* test, with *no one disputing* that such test was the appropriate standard. (See *id.* at pp. 245-247 & fn. 7.)

In *Bledsoe,* we first noted that other evidence at trial had established that the victim promptly reported the attack, immediately displayed emotional upset, and bore bruises and other signs of injury. We therefore inferred that the expert's testimony was *not* offered for the limited purpose of explaining any post-rape conduct (e.g., delayed reporting) which a lay jury might otherwise view as inconsistent with a forcible rape claim. Under our view of the facts, expert testimony describing the syndrome and applying it to this victim was used to prove that "a rape *in the legal sense* had, in fact, occurred." (36 Cal.3d at p. 248, italics added.)

*Bledsoe* understandably concluded that the counselor's testimony was erroneously admitted for this purpose. A careful reading of *Bledsoe* reveals that our primary concern was the logical irrelevance of the evidence: (1) the "syndrome" was designed solely as a nonjudgmental means by which to "identify, predict and treat" the victim's emotional problems; (2) since counselors rarely question the victim's factual account, the syndrome is an

---

of the MMPI; and (3) two administrations of "an electronic physiological test known as a penile plethysmograph." (185 Cal.App.3d at p. 804.) The psychologist explained that the latter test consists of a "device that fits over the man's penis" and "measures any changes in the blood flow to the penis, or erection" while the man views pictures of, and listens to audio tapes describing, sexual activity with adults and children. The psychologist in *John W.* noted that the defendant, like 20 percent of the convicted male sex offenders to whom the test had been administered, tested in the "nonresponsive" category. (*Id.* at p. 805.) The psychologist offered to testify that, in his opinion, the defendant, who had been charged with child molestation, "was not a sexual deviant." (*Id.* at p. 804.) In concluding that the trial court properly excluded the expert's opinion on *Kelly/Frye* grounds, the Court of Appeal in *John W.* made clear that it was referring *only* to the physical "penile" test. It observed that the psychologist did not personally believe the MMPI was a helpful indicator of sexual deviancy, and that he therefore did *not* rely upon it in forming his opinion. (See *id.* at pp. 804-805.)

inappropriate means of deciding the intricate *legal* issue of consent (i.e., whether the defendant reasonably, and in good faith believed that the victim consented *despite her good faith belief that she did not*); (3) the syndrome is characterized by a "broad range of emotional trauma" not limited to victims of rape; and (4) a counselor's assessment of the *victim's* feelings is not necessarily an accurate measure of whether *a third party,* namely the defendant, acted in legally culpable manner. (36 Cal.3d at pp. 249-250, & fn. 12.)

*Bledsoe* acknowledged a handful of out-of-state cases applying the *Frye* test to evidence of "rape trauma syndrome" on grounds that juries might view this therapeutic diagnosis as "scientific" proof a rape had occurred. (See 36 Cal.3d at p. 248.) However, *Bledsoe* did not hold that the *Kelly/Frye* test applied to the expert opinion in that case, nor did we discuss the test's relationship to "syndrome" or other expert psychological evidence in general.[22] *Assuming, like the parties, that the test did apply,* we simply concluded that the prosecution would not be able to prove that rape trauma syndrome was generally accepted by the counseling community to prove criminal guilt.

Faced with the question here, we are persuaded that *Kelly/Frye* did not preclude admission of Dr. Mitchell's proffered testimony. Expert opinion that defendants show no obvious psychological or sexual problem is circumstantial evidence which bears upon whether they committed sexual acts upon children, and is admissible "character" evidence on their behalf. The testimony and the matter upon which it is based also meet traditional standards for competent expert opinion, without need for additional screening procedures applicable to new, novel, or experimental "scientific" evidence not previously accepted in court. We conclude the trial court erred in using *Kelly/Frye* to exclude the testimony proffered by Grafton and Palomo.

■ Moreover, the error was prejudicial in this case. No physical evidence corroborated any of the five witnesses who testified against Grafton

---

[22] The Attorney General argues that, under *Bledsoe, supra,* 36 Cal.3d 236, use of "syndrome" or "profile" terminology by a mental health professional makes the diagnosis seem "scientific" to a jury, and thus invokes *Kelly/Frye.* We adopted no such per se rule in *Bledsoe,* despite its reference to concerns raised in out-of-state cases. We are not persuaded that juries are incapable of evaluating properly presented references to psychological "profiles" and "syndromes." In any event, the Attorney General misconstrues the proffered opinion. Dr. Mitchell acknowledged that studies disclose "general trends and characteristics" common to convicted child molesters insofar as certain test scales are typically triggered (e.g., "psychopathic deviant" and "depression"). However, as noted by defendants at trial and on appeal, Dr. Mitchell did not extract any all-encompassing "profile" from these studies, nor did he rely on them here. As we have discussed, his opinion focused on the absence of "indications of deviancy" in defendants' personalities, based on an interpretation of test and interview results.

and Palomo. Although four of these boys (Victor, J., A., and D.) stated that nude photographs were taken at Stoll's house on at least two separate occasions, no photos were discovered during an official search conducted several hours after the first child, J., was interviewed. No medical examinations were requested, even though J. told investigators that he had been sodomized as recently as two weeks before the interview.

Of course, there were no direct nonvictim accounts of the pertinent charged events. Mrs. M. corroborated her son Victor's testimony insofar as he claimed that two upsetting events—neither of which she witnessed—occurred while he was playing with Center Street friends. On the other hand, testimony by Chris's mother, Rochelle, lent support to Grafton's partial alibi defense.

It is true that at least one child-witness gave an unequivocal eyewitness account of Grafton's and Palomo's respective roles in each count under review (counts 1, 2, 3, 9, 24, 25). As to the group event charged in counts 1 through 3, the four witnesses confirmed that all defendants and several children were naked together at Stoll's house; two witnesses agreed that sexual "touching" of an unspecified nature had been committed against a third child that day.

Nevertheless, in several key respects, these same four children contradicted each other's account of the same event. Unlike Chris and A., D. was adamant that no adult committed sex acts upon him or *any* child. The other witness, J., could not remember having been sexually abused on that occasion, despite Chris's and A's testimony to the contrary. Also, Chris recalled no nude picture-taking, while the three other children disagreed as to the identity of the alleged photographer.

Further, the defense mounted a thorough attack on the credibility of each witness. Four of the children who testified against Grafton and Palomo (Chris, J., A., and D.) admitted that they had "lied" at the preliminary hearing. Chris and J. further conceded that their trial testimony contained at least one untruth. Pretrial statements of these four children, as well as the fifth child, Victor, contradicted their trial testimony as to the type of, or circumstances surrounding, the sex crimes at issue here. Finally, investigators specifically directed J., A., and D. to discuss sexual contact with defendants, including Grafton. Both A. and D. were told about J.'s accusations before they answered investigators' questions.

In light of the foregoing, the jury might well have been swayed by expert opinion testimony that neither Grafton nor Palomo was the "type of person" to commit the charged acts. The pair claimed to be romantically

involved, and were charged with far fewer crimes than the other two defendants. Dr. Mitchell's testimony would have lent credence to Grafton's and Palomo's personal denials of guilt. We therefore consider it reasonably probable that erroneous exclusion of the proffered testimony affected the judgment. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

Insofar as it upholds the convictions against defendants Grafton and Palomo, the judgment of the Court of Appeal is reversed.

Mosk, J., Broussard, J., Panelli, J., and Kennard, J., concurred.

LUCAS, C. J.—I respectfully dissent. As will appear, the standardized "personality function" tests at issue here, if used in the manner proposed by the two defendants in this case, are in all essential respects indistinguishable from polygraph, voiceprint or other scientific tests aimed at proving, or disproving, guilt. For that reason, these standardized tests must meet the usual *Kelly/Frye* standard for admissibility.

I readily acknowledge the admissibility of opinion evidence tending to show that the defendant's character or trait of character makes it unlikely that he or she committed a charged offense. (See Evid. Code, § 1102, subd. (a); *People* v. *Jones* (1954) 42 Cal.2d 219, 222 [266 P.2d 38] [defendant lacked usual characteristics of sex deviants].) I also recognize that such evidence may be presented in the form of expert testimony (see Evid. Code, § 801), which ordinarily is not subject to the *Kelly/Frye* admissibility standards (see *People* v. *McDonald* (1984) 37 Cal.3d 351, 372-373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]).

But the present case involves more than a simple expert opinion to the effect that defendant Grafton was a "normal" heterosexual whose character lacked the potential for sexual deviation. Instead, Dr. Mitchell, defendant's expert, was prepared to testify that he largely based his opinion of normality on certain standardized written tests, self-administered to defendant in her jail cell, which supposedly measured the subject's "general possibilities for abnormality in psychological function." According to Dr. Mitchell, the primary test, the Minnesota Multiphasic Personality Inventory (MMPI), consisting of 566 written questions, had several built-in "validity scales" designed to assure accuracy and detect lies by the person taking the exam. Dr. Mitchell observed that many experts believe the test makes it virtually impossible to conceal an abnormal personality profile.

After reviewing the test results and interviewing defendant in her cell for two hours, Dr. Mitchell was prepared to state his opinion that she had a "normal personality function," and "is falsely charged in this matter." He

qualified his latter response by opining that defendant probably has not "engaged in the past in sexual deviancy of any kind," and "it is unlikely . . . she would be involved in" the charged offenses. Dr. Mitchell testified that the scientific community generally accepts the MMPI as a valid measure of psychopathology. But, as the majority explains, the prosecutor's attempts to learn the scope of Dr. Mitchell's knowledge in this regard were "inconclusive." (Maj. opn., *ante,* at p. 1150.)

On cross-examination, the prosecutor developed the following: Dr. Mitchell could identify no studies indicating whether child abusers have ever registered "normal" on the subject tests. He conceded that some experts believe the MMPI may not identify "situational" child abusers, i.e., those offenders reacting to situational stress, rather than chronic, long-term abusers. Indeed, Dr. Mitchell acknowledged that persons acting under extreme emotional stress may not score reliably on that test. He also confirmed that although the reliability of these tests depends on the circumstances under which they are administered, neither he nor anyone else was present when the tests were completed by defendant Grafton in her jail cell.

Dr. Mitchell was unable to cite any studies on the validity of the subject tests as applied to individuals charged with either child abuse or incest. He acknowledged that on one occasion an admitted child molester had registered "normal" on an MMPI test he had given.

On this record, we might reasonably hold that the trial court, without abusing its discretion, could have excluded the evidence as unduly prejudicial to the People under Evidence Code section 352, or that in any event no prejudice to defendant could have resulted from its exclusion. I confine my dissenting remarks, however, to the *Kelly/Frye* issue. In my view, the concessions and omissions disclosed through cross-examination of Dr. Mitchell lend substantial force to the trial court's ruling that the subject tests were inadmissible because they failed to meet the *Kelly/Frye* standard of general acceptance in the scientific community.

The trial court excluded the proffered testimony on *Kelly/Frye* grounds because the defense failed to show the standardized test on which Dr. Mitchell relied was generally accepted in the scientific community. I would affirm that ruling.

I note initially that expert testimony is subject to the overriding requirement of *reasonable reliability.* Under present law, expert opinion evidence is limited to opinions based on matter perceived by or personally known to the witness "that is of a type that reasonably may be relied upon by an expert in forming an opinion . . . ." (Evid. Code, § 801, subd. (b).) The court is

entitled to examine the witness, prior to testifying, concerning the matter on which his opinion is based (*id.,* § 802), and to exclude opinion testimony based on matter "that is not a proper basis for such an opinion" (*id.,* § 803).

In my view, *Kelly/Frye* is unaffected by Proposition 8 (adding article I, section 28, subdivision (d) to the state Constitution). I doubt this "Truth-in-Evidence" provision was intended to deprive the trial courts of their traditional power to exclude unreliable scientific or expert testimony. By its terms, the provision is limited to "relevant" evidence, and evidence failing to meet *Kelly/Frye*'s reliability standard reasonably could be deemed *irrelevant* to the issues. I also note that the provision recites that it was not intended to affect any existing statutory rule of evidence relating to hearsay, or Evidence Code sections 352 or 1103. As the majority acknowledges, these exceptions may indicate an intent to preserve the general character or opinion evidence restrictions. (See *People* v. *Harris* (1989) 47 Cal.3d 1047, 1082 [255 Cal.Rptr. 352, 767 P.2d 619].)

The *Kelly/Frye* test is merely an application of the "reasonable reliability" standard to purported "scientific" methods of establishing guilt or innocence. Contrary to the majority's implication, nothing in our opinions in *People* v. *McDonald, supra,* 37 Cal.3d 351, or *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240], would flatly exempt expert testimony of the kind involved here, where such testimony rests in large part on the results or readings of a scientific test, process or procedure.

In *Kelly,* involving voiceprint identification procedures, we observed that generally, admissibility of expert testimony based on a new scientific technique involves a two-step process whereby (1) the reliability of the expert witness's methods are established, and (2) the witness is properly qualified as an expert to state an opinion on the subject. (17 Cal.3d at p. 30.) *Kelly* adopted the test for reliability of the technique itself from *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145]: The technique "must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

*Kelly* noted that the foregoing "general acceptance" standard is particularly appropriate when the scientific evidence, presented by experts, is apt to be given considerable, perhaps undue, weight by lay jurors impressed with the "posture of mystic infallibility" which such evidence frequently may present. (17 Cal.3d at pp. 31-32, quoting an earlier case.) *Kelly* held that neither case law nor scientific articles satisfactorily established that the voiceprint technique had been generally accepted in the scientific community.

In *McDonald,* we held simply that the trial court erred in excluding defense expert testimony on the psychological factors that might undermine the accuracy of eyewitness identifications. We declined to apply *Kelly/Frye* to such expert testimony, noting that this standard has never been applied to expert testimony of that kind. Significantly, in *McDonald* we distinguished between general expert opinion testimony (where the jurors can employ "healthy skepticism" to temper their acceptance of the proffered opinion) and evidence presented by an expert but produced by a "machine," i.e., "an apparently 'scientific' mechanism, instrument *or procedure*" (where the "aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative"). (37 Cal.3d at pp. 372-373, italics added.) Of course, as we made clear in *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354], *Kelly/Frye* is not limited to "machines" or techniques that involve the manipulation of physical evidence: Testimony based on a new scientific process "operating on purely psychological evidence" would be subject to the *Kelly/Frye* test. (*Id.* at p. 53.)

Close on point is *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], in which we found error in admitting evidence of "rape trauma syndrome" to assist in proving that a rape occurred. A careful reading of that case reveals, contrary to the majority's interpretation herein, a strong implication that diagnosis of the syndrome constituted a new scientific technique which must satisfy the *Kelly/Frye* test. As we held in *Bledsoe,* "Because the literature does not even purport to claim that the syndrome is *a scientifically reliable means of proving that a rape occurred,* we conclude that it may not properly be used for that purpose in a criminal trial." (*Id.* at p. 251, italics added.) The diagnostic tests at issue here are essentially indistinguishable. Indeed, in my view, the need for *Kelly/Frye* compliance is even more compelling than in *Bledsoe,* for unlike rape trauma syndrome evidence, the "personality function" test results proffered here were offered not merely to prove that a crime occurred, but to prove that defendant Grafton could not have committed it. In other words, the essential thrust of the "character" evidence was directed to the crucial issues of guilt or innocence.

The majority nonetheless disputes the application of *Kelly/Frye* to the standardized tests that formed the basis for Dr. Mitchell's testimony. The majority observes that "[t]he methods employed are *not* new to psychology or the law, and they carry no misleading aura of scientific infallibility." (*Ante,* at p. 1157.) I disagree on both counts.

First, in my view a new application of these standardized tests is indeed involved here. As indicated previously, I acknowledge that California

courts have allowed expert opinion on the subject of a defendant's mental state, including character evidence indicating the likelihood that he could not have committed the charged offenses. Moreover, I realize that some courts have admitted expert opinion based on standardized tests, similar to those administered here, to form a psychiatric diagnosis of a defendant's mental state at the time the alleged acts were committed. (See maj. opn., *ante*, at p. 1154, and cases cited.) But using such tests to formulate a psychiatric diagnosis of the defendant's mental state is far different than using them *to exclude defendant from the relevant class of offenders* in much the same manner as a blood test or voiceprint.

Dr. Mitchell indicated that these tests are used in clinical practice as diagnostic and treatment tools, but he did not suggest that they are commonly used in criminal proceedings to identify, or exclude, deviant personalities. As stated in the majority opinion of the Court of Appeal herein, "Dr. Mitchell . . . failed to establish the *general acceptance of reliability* [of the testing at issue] in the particular field to which it belongs. A test may be widely utilized as a tool or a guide while recognizing and accepting the fact the procedure lacks the desired certainty."

As conceded by defense counsel at oral argument, no cases exist which sanction such a revolutionary application of standardized test procedures as was attempted in this case. I think it ironic that all three of the cases from our court cited by the majority herein as *supporting* reliance on standardized psychological tests, such as the MMPI involved here, contained references to doubts or concerns regarding the value of such tests. In *People* v. *Coogler* (1969) 71 Cal.2d 153, 166-167 [77 Cal.Rptr. 790, 454 P.2d 686], in which the prosecution produced no evidence to rebut the defendant's showing of diminished capacity (based in part on the MMPI), we observed that "a jury could properly reject the [defense] expert's conclusions because of doubt as to the material upon which these conclusions were based." In *People* v. *Cruz* (1980) 26 Cal.3d 233, 248 [162 Cal.Rptr. 1, 605 P.2d 830], we noted that one of the psychiatrists testifying at the defendant's trial "explained to the jury why he did not use [standardized] psychological tests: He believed, based on years of experience, that they were *not reliable.*" (Italics added.) And in *People* v. *Coleman* (1985) 38 Cal.3d 69, 80 [211 Cal.Rptr. 102, 695 P.2d 189], we pointed out that a testifying psychiatrist "characterized the use of psychological tests such as the . . . Minnesota Multiphasic Personality Inventory as *lacking in reliability and inappropriate for use in forming an opinion* on whether an accused possessed a certain mental state at some time in the past." (Italics added; see also *People* v. *John W.* (1986) 185 Cal.App.3d 801, 804-805 [229 Cal.Rptr. 783] [expert testimony doubting utility of MMPI in detecting deviant sexuality].)

Contrary to the majority's implication herein, *none* of the foregoing cases indicated that the MMPI or similar standardized psychological tests were generally accepted by the scientific community, and *none* involved attempts to prove the defendant's factual innocence through the guise of expert "character" evidence. Indeed, the only case I have found in which such an attempt was made resulted in an affirmance of a ruling *excluding* the evidence. (*People* v. *John W., supra,* 185 Cal.App.3d at p. 806.) Thus, I would conclude the standardized tests relied on by Dr. Mitchell do indeed involve a "new," unprecedented scientific technique within the proper scope of *Kelly/Frye.*

Second, as for *Kelly/Frye*'s element of an "aura of infallibility" surrounding the disputed technique, Dr. Mitchell's offer of proof included his opinion that the tests he relied on were accurate, having a better than 70 percent chance of being right and, according to some experts, being virtually impossible to conceal one's deviant character from the tester. Dr. Mitchell described as a "fair characterization" a colleague's observation that "achieving a normal profile in the MMPI is like walking through a minefield and coming out intact." Significantly, according to Dr. Mitchell, built-in "validity scales" supposedly assured that no intentional concealment of a deviant personality could occur. Quite clearly, a jury could be unduly swayed by such claims of accuracy and invincibility.

It is apparent that, based on Dr. Mitchell's description, the standardized tests combined elements of (1) a lie detector, aimed at uncovering untruthful test responses, and (2) a "personality print," i.e., a supposedly foolproof scientific method of matching a suspect's personality traits with the offense in question, much in the same way that voiceprints, fingerprints, blood or semen samples, are used to match or exclude a suspect.

The majority concedes that polygraph and voiceprint techniques are unquestionably subject to *Kelly/Frye.* In my view, Dr. Mitchell's "validity scales" and "personality print" should be subject to the same scrutiny. (See also *Seering* v. *Department of Social Services* (1987) 194 Cal.App.3d 298, 311 [239 Cal.Rptr. 422] [child sexual abuse accommodation syndrome subject to *Kelly/Frye*]; *In re Amber B.* (1987) 191 Cal.App.3d 682, 690-691 [236 Cal.Rptr. 623] [use of anatomically correct dolls to support psychiatric opinion of child molestation subject to *Kelly/Frye*].) In both *Seering* and *Amber B.* the courts stressed the likelihood that a jury would place undue weight on the scientific nature of the underlying evidence.

I do not suggest the results of these tests are necessarily inadmissible. The purpose of *Kelly/Frye* is not to exclude evidence but to test its *reliability* by giving the members of the scientific community "the determinative voice"

in deciding that issue. (See *People* v. *Kelly, supra,* 17 Cal.3d at p. 31, quoting from *United States* v. *Addison* (D.C. Cir. 1974) 498 F.2d 741, 743-744 [162 App.D.C. 199].) There may well be a body of scientific research showing that the standardized measures of "personality function" are generally accepted by mental health experts as scientifically reliable tests of sexual deviancy or normality. On this record, however, such evidence is conspicuously absent.

With due respect, I am concerned about the potential consequences arising from the majority's holding. I foresee complicated and time consuming "mini-trials" devoted not to the factual issue of guilt or innocence of the accused, but focusing instead on his "personality profile" and its correlation with the profile displayed by the average child molester, robber, arsonist, or whomever. Presumably, the People would have the opportunity to rebut the defendant's showing, using their own experts and standardized tests. (See Evid. Code, § 1102, subd. (b).) The prospects for sidetracking the trial's "main event" are enormous.

I would affirm the Court of Appeal's decision upholding defendant's conviction.

Kaufman, J., concurred.