Filed 8/28/13  P. v. Johnson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>BYRL FATEI JOHNSON,<br><br>        Defendant and Appellant. | A134722<br><br>(Solano  County<br>Super. Ct. No. VCR204879) |
| In re BYRL FATEI JOHNSON,<br><br>        on Habeas Corpus. | A138088 |

Byrl Johnson was convicted of molesting two young girls and sentenced to 35 years to life in prison.  Johnson contends in this consolidated appeal and petition for a writ of habeas corpus that his trial lawyer was ineffective because she failed to investigate and present an involuntary intoxication defense or present expert testimony that he does not fit the profile of a child molester.  We are not persuaded.  Johnson is unable to show that his lawyer could not have made the strategic choices she did for any conceivable tactical purpose.  Accordingly, we affirm the judgment and deny Johnson's habeas petition.

1

# BACKGROUND

Eight-year-old M.R. and six-year-old B.H. were best friends and neighbors at the time of the relevant events. Jamie J. is M.R.'s mother. Her boyfriend, Ken, is Johnson's nephew.

On the afternoon of June 14, 2009, Jamie and Ken took M.R. and B.H. to a barbecue at the home of Johnson's friend, Patty. The barbecue lasted late into the night. The adults, including Johnson, watched the NBA playoffs and drank. The girls were jumping around and acting rowdy, "Just, you know, just doing silly things."

The girls wanted to spend the night at Patty's house, and Jamie agreed. By the time Jamie and Ken went home around midnight, Johnson had gone upstairs to bed. Jamie assumed the girls would sleep downstairs in the living room. From this point the witness accounts diverge until Jamie and Ken returned to pick the girls up the next morning.

## M.R.'s Testimony

M.R. was 10 years old at trial. She testified that she and B.H. spent the night of the barbecue in Patty's room with Patty and Johnson. The girls slept "in the end of the bed." She wore her underwear and a big t-shirt to bed because she did not have pajamas with her.

When M.R. and B.H. woke up the next morning, Patty was gone and Johnson was still asleep. The girls woke Johnson up by jumping on the bed. Then Johnson touched M.R. beneath her shirt "on my chest" and "down on my private part." He rubbed his hand all over her chest. Johnson rubbed B.H.'s chest too, but M.R. did not remember whether his hand was underneath or on top of B.H.'s clothing. Johnson touched the outside of M.R.'s panties, but not underneath them.

On cross-examination, M.R. said she and B.H. slept on the bedroom floor and Patty and Johnson slept in the bed. Johnson was angry when the girls woke him up. Initially, M.R. testified that Johnson pulled her leg to make her lie down on the bed and then touched her, but she also testified that she decided to lie down because she was tired. Then she said "it was something around there that somebody pulled my leg and I fell

2

down," but she did not know who the "somebody" was.  Then she again said she was tired so she lay down next to Johnson, but also that somebody pulled her down, and then "I laid down because I was tired."

Johnson rubbed M.R.'s chest and "tummy" and touched her between her legs.  In an earlier interview at the Rainbow Center, M.R. said Johnson only touched her tummy and chest, not anywhere else.  At trial, she testified that he also touched her "near my legs" and that she told this to the man at the Rainbow Center.  While defendant was touching M.R., B.H. was still jumping on the bed.  M.R. pulled Johnson's hand away and moved farther from him, but he "scooted closer" and started to rub her all over.  Then B.H. pulled M.R. up, and the girls went downstairs.  Later, they went back and jumped on the bed some more before they left again to go downstairs to the kitchen.  Johnson came downstairs and made them chicken soup, then he went back upstairs.  M.R. and B.H. returned to Johnson's room and started lighting matches he gave them to play with.  They also played marbles with Johnson.

### B.H.'s Testimony

B.H. was eight years old at trial.  She and M.R. slept on the floor at the end of the bed.  When they woke up in the morning, Patty had already left for work.  The girls got up and jumped on the bed.  Johnson woke up and "pulled us down and started touching us in private places."  He touched M.R. "[o]n the sides near her private area," but nowhere else.  He touched B.H.'s chest, but not M.R.'s.  Johnson touched the girls under their long t-shirts but did not put his hand inside their panties.  B.H. pulled Johnson's hand as he was touching M.R. and the girls ran off and started playing on the stairs.

Later, M.R. and B.H. went back into the bedroom and jumped on the bed some more.  Johnson woke up and told them to get off, but instead the girls sat on the end of the bed.  He did not make the girls breakfast or soup.  B.H. did not remember playing with matches and did not know whether or not she did.

3

### *Jamie's Testimony*

When Jamie and Ken arrived to pick them up the next morning, the girls rushed to the door looking frantic and scared. They said Johnson had played with M.R.'s chest, patted her private parts, and put his thumbs between her leg and vagina.

Johnson was upstairs in the bedroom. Patty was still at work. Jamie and Ken spoke with Johnson, then stayed at the house until Patty came home in the early afternoon. The girls repeated their story to Jamie and Patty, and later at home Jamie continued to talk to them about the incident. Throughout the day, the girls remained adamant about what Johnson did to them.

That evening Johnson came to Jamie and Ken's home. At one point Ken went outside, and Jamie had a private conversation with Johnson while sitting in his lap. Ken came in and asked Jamie why she was sitting there. She told him it was not anything. Jamie called the police the next morning.

### *Ken's Testimony*

Ken testified that he and Johnson drank "more than the limit" at the barbecue. He did not want to believe what the girls told them about Johnson when he and Jamie returned to get them the next morning. Johnson was upstairs on the bed, still dressed in his clothes from the previous night. Ken could tell he "was still been drinking or feeling it from the night before." Ken discussed the girls' allegations with Johnson that morning and again that evening when Johnson came over to his house. Ken did tell Jamie to get off of Johnson's lap, but he was not angry about it.

The next day Ken called the police. He also called Victoria James, Johnson's girlfriend, and told her about the alleged molestation. Ken explained that he and Jamie "knew that [Johnson had] been doing things to [James] and this and that and figured she was upset and that she got the kids and Jamie got kids, and I was like this is what my uncle doing." He asked James to tell the police about an incident in which he thought that Johnson had attacked James's car or house with a baseball bat, but he did not tell her to say Johnson beat her with a baseball bat, and he did not ask her to lie to the police.

Jamie and Johnson did not get along and had gotten into a couple of confrontations since Jamie and Ken started dating.

### Officer Bassett's Testimony

Vallejo Police Officer Mark Bassett was the investigating officer and attended the police interviews of both girls at the Rainbow Center in August 2009. M.R. said that she and B.H. were jumping on the bed when she got tired and decided to lie down next to Johnson. She never said she was pulled down onto the bed. When M.R. was asked where Johnson touched her, she said that he rubbed her chest and tummy. Johnson also rubbed the area between "the hem of her panty line and her thigh area," but M.R. repeatedly said he did not touch her privates or put his hand inside her underpants. M.R. did not say that Johnson also touched B.H. during this interview, but later in a second interview she was asked whether Johnson touched anyone else. She responded that Johnson touched B.H. while B.H. was bouncing on the bed.

B.H. told Officer Bassett she saw Johnson put his hand inside the top of M.R.'s panties and touch her "coco," the area under her panties. M.R. smacked Johnson's hand away and said, "Don't touch me like that." B.H. also said Johnson put his hand under her own shirt, and she slapped him. None of the prior police reports reflected that B.H. had claimed Johnson touched her too.

### Victoria James's Testimony

Victoria James dated Johnson between January and June 2009, but broke up with him in June because of his heavy drinking. Ken told her about the girls' accusations and told her to tell the police that he had beaten her with a baseball bat. Ken knew this was a lie. James testified that her relationship with Johnson was peaceful, but she admitted that she sought a restraining order after a violent incident in September 2009 to get Johnson out of her house and help him stop drinking.

### Johnson's Testimony

Johnson testified that he drank heavily at the barbecue, "upwards of [a] quarter of a gallon." The next morning when he woke up he was hung over but not drunk. The

girls were screaming and jumping on the bed. He screamed at them and "told them to get the 'F' off the bed," but they just laughed and kept jumping. Then he threatened to tell their parents if they did not stop. M.R. stopped, but B.H. did not, so Johnson pushed M.R. off the bed and the girls left the room. Johnson drank a shot of alcohol and continued to doze on and off until the girls came back and resumed their jumping. Johnson again responded by yelling at them and saying he would tell Jamie. B.H. told him to stop yelling at her or she would "tell on [him]." The girls left again, but a while later they returned and started striking matches against the bedroom furniture. Johnson jumped up and the girls ran off. They all went downstairs, where Johnson made the girls soup and sandwiches for breakfast. After breakfast the girls played, and Johnson showed them how to play marbles before he returned upstairs to nap and drink brandy.

Later that afternoon Patty told him about the girls' accusations. That night Johnson went over to Ken and Jamie's house. He testified: "I was crying. I was telling them, 'You know me better than that. Why would you even ask me some shit like that?' " Ken and Jamie assured him that the matter "was already squashed" and would not go any further.

Later, after Ken left, Jamie sat on Johnson's lap to console him. When Ken returned, he asked what was going on and told Jamie to "get the fuck off" Johnson's lap. Jamie immediately got up, and she and Ken "kicked [Johnson] out."

Johnson had never previously been accused of a sexual crime. He denied that he ever touched either girl's chest or private parts. He pushed M.R. because he was angry, not for a sexual purpose, and he did not touch B.H. at all.

On cross-examination, Johnson acknowledged that he never said he pushed M.R. off the bed before he testified at trial. He said that in his police interview he did not remember pushing her. He told Officer Bassett that he never "touched" M.R. because a push is different from a touch and because it is an assault that could get him in trouble. In addition, he thought the officer was only asking him about sexual touching, and the push was not of that nature.

6

Johnson admitted that he was convicted of terroristic threats in 2001 and vandalism in 2004. He had taken a plea bargain in "every case [he'd] ever had," but he rejected an offer of a three-year sentence in this case because he was innocent. He is not sexually attracted to children and has never before been accused of sexual or other misconduct involving children.

Officer Bassett was called by the defense as a rebuttal witness. He interviewed Johnson in September 2009. Johnson repeatedly said the girls woke him by jumping on the bed, and that he kept threatening to spank them and tell their mother unless they stopped. Johnson said he was very drunk and had passed out the night before. The girls could not possibly have misinterpreted an innocent or accidental touching because he did not touch them in any way. He specifically denied that he grabbed the girls to get them off the bed or spanked them, "because he doesn't touch children." Rather, the girls were lying.

Johnson knew Patty was going to go to work that morning, but he thought she would only be gone for 30 minutes at most.

### Verdict and New Trial Motion

The jury convicted Johnson of two counts of committing a lewd act against a child under 14 years of age (Pen. Code, § 288, subd. (a)) and found that he committed the offenses against multiple victims.[1] The court found true a prior strike and a prior serious felony allegation.

Johnson moved for a new trial on the ground, among others, that his trial counsel failed to investigate and raise a voluntary intoxication defense. At the hearing on the motion he presented evidence of his history of heavy alcohol consumption and expert psychiatric and legal testimony.

Keith Knockum testified he had known Johnson for about 20 years and believed him to be a functional alcoholic. He would drink "as much as he had on hand," and "[i]f

---

[1] Further statutory citations are to the Penal Code.

7

it was a large bottle there, he'll finish it." Caroline Huggins had known Johnson for 44 years. She testified he drank hard liquor "every day throughout the day," and would drink until he passed out. Carmen Humphrey had known Johnson for 16 years and had three children by him. She testified he drank "[b]asically 24 hours a day. . . . [¶] He would wake up and go to sleep and get up and drink again." He seemed to be drunk most of the time.

Johnson testified that he drank from three-fourths of a liter to half a gallon of 80 proof brandy a day throughout his adult life. He regularly drank until he passed out; he explained "[t]hat's how I go to sleep." He often woke up in vomit. Alcohol was a factor in his prior convictions, and his parole conditions prohibited him from possessing alcohol or being in a liquor store. From his own perspective he is never drunk, even though "anybody else seeing me would say I was drunk. To me, I'm hungover. I'm never drunk to myself." That's why he testified at trial that he was hung over, but not drunk, the morning after the barbecue. People told him he drank too much, and on many occasions he was told he did things he could not remember doing.

Johnson remained adamant that he did not sexually assault the girls. However, he sent multiple letters to his trial attorney and others asking if there was any possibility it could have happened. He had gone to bed drunk and remembered being woken up the next morning. As far as he could remember, he did not rub the girls' bare chests, and there was no chance he would have done so if he were sober. He had asked for an expert to determine if he could have done it without remembering because of his drinking. However, he never told the jury he had difficulty remembering what happened that morning or that he was too drunk to understand what was happening. He was adamant at trial that there was no way the girls could have misinterpreted something he did because he did not touch them in a sexual way. Asked if he thought alcohol could have caused him "to do these things," Johnson responded "I'm pretty sure. I'm, not sure. That's why I'm asking—that's why I needed—that's why I asked for an expert."

Dr. Murray Eiland testified as an expert in forensic psychiatry. Dr. Eiland met with Johnson for an hour and a half about six weeks before the new trial hearing.

8

Johnson's self-reported drinking history indicated that he was a very serious alcoholic. Heavy chronic drinking can affect the drinker's thought process, cause brain damage, and disrupt cognition and perception. Chronic, heavy drinkers can have episodes of "sleepwalking," during which they move and apparently function and yet are unaware of their actions. They may also "confabulate," or create memories of things that did not happen. Chronic alcoholics may also experience blackouts, although not all do, and it is common for them to minimize and deny their drinking.

Johnson did not tell Dr. Eiland that he did not remember what happened the morning after the barbecue. He was clear and adamant that he did nothing inappropriate to the girls; he just wanted them to go away so he could sleep.

### *Johnson's Attorneys*

Johnson told attorney John Mendenhall, who initially represented him, that he was "100 percent not guilty of these offenses." Johnson had always entered guilty or no contest pleas if he was guilty in the past, but he insisted he did not commit these crimes.

Elena D'Agustino, a chief deputy in the Solano County Public Defender's Office, took over Johnson's representation in December 2009. She had been a deputy public defender for approximately 14 years and had tried around half a dozen section 288 cases, although none but Johnson's involved multiple victims. She did not remember whether she had ever defended a client against a section 288, subdivision (a) charge by arguing alternatively that there was no touching, but if there was, it was not sexual.

Johnson consistently and adamantly insisted to D'Agustino that he did not touch the girls sexually. D'Agustino did not remember Johnson either expressing difficulty remembering what had happened or saying that he remembered the events clearly. The defense she presented was that the alleged events did not occur; either the children were lying or they did not know what they were talking about. Late in the trial she asked for a standard jury instruction on voluntary intoxication. She thought, but was not certain, that she did so because Johnson requested it.

9

D'Agustino knew Johnson was a heavy drinker, and Johnson told her he was intoxicated the morning after the barbecue, drank more that morning, and was hung over. One of the trial witnesses told D'Agustino's investigator that Johnson was "pretty drunk" that morning, but his trial testimony on that point was not as strong. D'Agustino did not remember considering or investigating intoxication as a potential defense, or whether she discussed it with Johnson. "I know that we had a lot of conversations about the case and conversations about, um, all the aspects of the case. Um, I don't specifically remember discussing [an intoxication defense] with him. I don't remember one way or another. We may have discussed voluntary intoxication as a defense. We may not have. I don't remember. I looked in my file, and I did not take very good notes in this particular case, so I don't know."

D'Agustino did not consult with a psychiatrist, psychologist or other expert for assistance in evaluating how alcohol could have affected Johnson's behavior; nor did she speak to any of his relatives or acquaintances about his drinking. She did not remember why she did not present, or why she decided against presenting an intoxication defense. Johnson had mentioned blacking out after drinking. D'Agustino was not certain, but she did not think he told her he blacked out on the morning of the offense.

The parties stipulated to certified criminal law specialist Daniel Russo's expertise in the adequacy of legal representation. Russo testified that Johnson did not receive reasonably competent legal assistance at trial and that his attorney's failings were prejudicial. He believed Johnson's case presented grounds for raising both an intoxication defense and a "*Stoll* defense," in which expert testimony is presented to support a claim that the defendant does not fit the profile of a child molester. (See *People v. Stoll* (1989) 49 Cal.3d 1136, 1161.) In Russo's view, Johnson's numerous arrests and convictions for alcohol-related offenses and the fact that none of his many priors were sex-related "is like an alarm going off for anybody who represents someone charged with a sex offense." He believed a reasonably effective defense attorney would have raised both defenses "because of Mr. Johnson's colorful criminal history combined with his history of alcoholism that's obvious from reading his rap sheet and the fact of even

10

though he has numerous offenses and different type of offenses, he doesn't have anything that looks in any way like a sex offense." In Russo's opinion, if Johnson had competent representation at trial "I don't think [he] would be sitting here."

Russo said there was no valid tactical reason for defense counsel not to argue both innocence and voluntary intoxication in the alternative, particularly as Johnson was facing what was effectively a life sentence. In his view, a reasonably competent attorney would have both raised an innocence defense and argued that, if Johnson did do it, he was so intoxicated that he lacked lewd intent. Russo himself had presented both defenses in a multiple victim child molest case. Here, there were no facts, including Johnson's statement that he woke up with a hangover, that contradicted an intoxication defense. Defense counsel could present expert testimony that Johnson's blood alcohol level would still have been high the morning after the barbecue, whether or not he felt hung over. Nor did Russo believe Johnson's adamant denials of having touched the girls was reason not to present an alternative intoxication defense.

The court ruled against Johnson. It explained its decision from the bench: "Defendant's articulated testimony at trial was that he recalled the events of the morning in question. That he did not commit the alleged act, and stated nothing about being under the influence. Months later, when interviewed by police, I think at San Quentin, he gave the same story. Last Friday, a few days ago, he implied he was under the influence of alcohol. [¶] This Court as well as Mr. Russo, as an expert for the Defense, he was sitting here while the attorneys testified. We all heard from attorneys Mindenhall and D'Agustino, and based on that testimony and review of the entire record Mr. Russo opined that ineffective assistance of counsel has been shown based on, among other things, failure to pursue the intoxication defense; the [Stoll] defense; that the Defendant was not a molester, and the failure to pursue a 402 hearing regarding 8- and 10-year-old witnesses [competence] to testify in the first place. He also opined that arguing inconsistent defense[s] would have been appropriate. . . .

11

"I disagree. Ms. D'Agustino acted as a reasonable, competent attorney both in preparing and investigating the case and in her performance before the jury. I have known Mr. Russo for over 30 years both professionally and personally. He's a superior trial lawyer and deserves his excellent reputation. I disagree with his opinion regarding Defense Counsel's performance and regarding the wisdom of presenting inconsistent defenses. Juries don't like it.

"Regarding the Defendant's testimony, I find it self-serving and inconsistent with his pretrial and trial testimony. Even if Defendant's attorneys were not diligent advocates, the Court opines it is not a reasonable probability that a more favorable result would have been obtained in the absence of Counsel filing Defendant's motion."

Johnson filed a timely appeal from the judgment.

### The Habeas Corpus Petition

While this appeal was pending, Johnson filed a petition for a writ of habeas corpus addressed to the same issue of trial counsel's performance. The petition primarily repeats the arguments made in the appellate briefs, but supplements them with a March 11, 2013, evaluation by psychologist Douglas Korpi, Ph.D.

Dr. Korpi interviewed Johnson, administered two actuarial measures sensitive to sexual reoffense, and reviewed various legal records  Dr. Korpi concluded by ruling out a diagnosis of pedophilia: "Mr. Johnson is a 48-year-old man with an extensive criminal history who has found himself committed to State Prison for a period of 30 years referent to the molest of two girls, this occurring over the period of less than an hour and within the context of the Defendant likely being drunk, hung-over, and within the context of being awoken and feeling annoyed by the girls jumping on his bed. Even if we grant that he touched both of the girls in a sexual manner, such behavior, over such a limited period of time, comes nowhere close to being a sufficient basis for a diagnosis of Pedophilia. Indeed, the case factors in this matter all go against a diagnosis of Pedophilia. First, there is no prior history whatsoever of sexual misconduct directed towards children in this case. This is particularly salient given the fact that this is a man who has led a life of such wild abandon that he would have been more likely than not to have committed a

12

prior sexual offense against a child than would the typical pedophile, what with his general lack of control. As to the "set-up" leading to the crime, note that the Defendant did not, in any obvious way, ask the girls up to the room, lure them, or behave in any sexually provocative fashion whatsoever. The girls came to him in all innocence and his behavior occurred within the context of his awakening from a drunken stupor. I have been one of the Chief Consultants to the California Department of Mental Health's Sexually Violent Predator Unit for over 10 years, and none of us (there are approximately 70 psychologists or psychiatrists on this panel) would diagnose a Pedophilia. Even more, it is often the case that we make a diagnosis of Pedophilia on a 'provisional' basis when we suspect that the instant behavior is but the tip of the iceberg. In this case, we would not even suspect that."

However, Dr. Korpi did diagnose antisocial personality disorder and alcohol dependence. He wrote: "I am most ready to believe that this is a man who is essentially lawless and easily diagnosable as suffering an Antisocial Personality Disorder. His behavior problems stretch back to early adolescence and include charges related to weapons possession, battery, resisting arrest, terrorist threats, public drunkenness, and vandalism. He has grave difficulties abiding by the terms of probation or parole, he lives life with an abandon, and all with a certain disconcern for his own and others' well-being. As well, his multiple arrests related to public intoxication give credence to his self-report of alcohol abuse. This does indeed appear to be a man who has been relatively continually drunk since approximately 2003, at least whenever he is not in custody. He drinks, quite literally, morning, noon, and night."

We ordered the habeas corpus petition consolidated with this appeal and deferred deciding whether to issue an order to show cause until we considered the issues on appeal.

13

## DISCUSSION

### I. Legal Standards

The federal and state Constitutions guarantee criminal defendants the right to effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422–423 (*Pope*).) That right is violated when defense counsel's failure to adequately prepare the case "results in the withdrawal of a crucial or potentially meritorious defense." (*Pope, supra,* 23 Cal.3d at p. 424, fn. 14.)

To establish ineffective assistance of counsel, the defendant has the burden to show his attorney's performance fell short of "an objective standard of reasonableness [¶] . . . under prevailing professional norms" and that there is a reasonable probability the outcome would have been more favorable but for counsel's errors. (*Strickland*, *supra*, 466 U.S. at pp. 687–688, 695; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694.)

When a defendant raises a claim of ineffective assistance of counsel, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland, supra,* 466 U.S. at p. 689.) As explained in *Strickland,* "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Ibid.*)

Under this deferential standard, the conviction must be affirmed "where the record shows that counsel's omissions resulted from an informed tactical choice within the range

14

of reasonable competence." (*Pope, supra,* 23 Cal.3d at p. 425.) "Because it is inappropriate for a reviewing court to speculate about the tactical bases for counsel's conduct at trial [citation], when the reasons for counsel's actions are not readily apparent in the record, we will not assume constitutionally inadequate representation and reverse a conviction unless the appellate record discloses ' "no conceivable tactical purpose" ' for counsel's act or omission. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 674–675.) Deferential review, however, " ' "is not abdication" [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions. Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance.' " [Citation.] (*People v. Jones* (2010) 186 Cal.App.4th 216, 236.)

On appeal from the denial of a motion for new trial based on ineffective assistance of counsel, we review the court's factual findings for substantial evidence. However, the ultimate issues of whether counsel's performance was constitutionally deficient, and if so, whether counsel's failings were prejudicial, are mixed questions of fact and law which we review independently. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

## II.  Failure To Pursue An Intoxication Defense

Johnson contends D'Agustino should have argued both that he did not molest the girls and, alternatively, that if he erroneously believed he did not do it, because of his chronic drinking he acted without the lewd intent required for conviction under section 288. He acknowledges that an informed decision *not* to present an intoxication defense after investigating its strengths "arguably might have withstood constitutional scrutiny." But D'Agustino conducted no such investigation. Her omission, Johnson asserts, constituted ineffective representation.

Our analysis of his claim is more nuanced than Johnson suggests. While strategic choices made after thorough investigation are "virtually unchallengeable," choices made

15

"after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  (*Strickland, supra,* 466 U.S. at pp. 690–691, italics added.)

Strickland also cautions that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."  (*Strickland, supra,* 466 U.S. at pp. 690–691.)

Thus our analysis does not end with D'Agustino's decision not to investigate a potential intoxication defense.  Her reasons for not doing so are unknown:  she testified that she did not remember whether she considered the defense, why she did not investigate it, or why she ultimately did not present it.  Accordingly, to establish ineffective representation, Johnson must show there could have been "no conceivable tactical purpose" for D'Agustino's inaction.  (*People v. Lewis, supra,* 25 Cal.4th at pp. 674–675; *Strickland, supra*, 466 U.S. at p. 691.)  He has not done so.  D'Agustino was asked at the new trial hearing whether, for a defense attorney trying a section 288 case, there would be concerns about arguing to a jury "an absolute total denial of sexual touching with these girls," on the one hand, and "the alternative argument that, well, if he did touch them, he just didn't know what he was doing."  D'Agustino responded that the

16

tactic could be dangerous. She explained: "it's presenting two inconsistent defenses that could [ ] cause a jury to disregard both of them. . . " and that whether to do so must be decided on a case-by-case basis. In this case, that decision would have to take into account Johnson's adamant denials of any sexual touching, his detailed recollection of the morning's events, and his statements that he was hung over, but not drunk, that morning.

Defense counsel would also have to consider the difficulty of persuading a jury that Johnson in fact committed the charged acts and yet was too drunk to have done so with the specific intent to arouse, appeal to, or gratify his or the children's "lust, passions, or sexual desires." (§ 288, subd. (a).) But, the very nature of the touchings as alleged by the girls permitted no explanation other than sexual gratification. (See *People v. Jones* (1954) 42 Cal.2d 219, 223 [specific intent required for section 288 conviction was necessarily present if the physical act was as the complaining witness claimed]; *People v. O'Tremba* (1970) 4 Cal.App.3d 524, 528 [same, citing *Jones*].) To persuade the jury that Johnson could have committed the charged acts without the lewd intent required for conviction, counsel would have had to argue that Johnson was intoxicated *to the point of unconsciousness* when he rubbed the girls' bare chests and fondled them near, on or under their panties. (See § 29.4, subds. (a), (b) [unconsciousness caused by voluntary intoxication is not a complete defense, but can negate specific intent]; *People v. Hughes* (2002) 27 Cal.4th 287, 343–344 [voluntary unconsciousness during alcohol-induced blackout]; *People v. Ochoa* (1998) 19 Cal.4th 353, 423–424 [unconsciousness can exist where the person acts, but is not conscious of acting at the time].) But there is precious little support for such a theory in this record. True, Johnson mentioned having blackouts in the past, but he did not report having one the morning after the barbecue. To the contrary, Johnson both denied he was drunk when he woke up and provided a detailed description of the morning's events. The strongest support for an unconsciousness defense is Dr. Eiland's testimony that heavy chronic drinkers can experience sleepwalking-like episodes, in which they function but are unaware of their actions. But

17

with no indication that this happened the morning in question, and, on the other hand, Johnson's seemingly clear recollection of that morning's events, defense counsel could have reasonably decided that the chances of prevailing on an unconsciousness theory were outweighed by the danger of weakening Johnson's claim of actual innocence.

Because the record discloses plausible tactical reasons not to pursue an intoxication defense, Johnson's claim that his trial counsel performed inadequately because she did not do so provides no basis for disturbing the judgment. (See *People v. Lewis, supra,* 25 Cal.4th at pp. 674–675.)

### III. Failure To Present A *Stoll* Defense

Johnson also asserts, both in his appeal and in his habeas petition, that competent counsel would also have researched and presented a *Stoll* defense. As we have noted above, *ante,* at p. 10, a *Stoll* defense would have relied on an expert opinion that Johnson does not fit the profile of a child molester to provide circumstantial character evidence that he did not commit the charged offenses. (*Stoll*, *supra*, 49 Cal.3d at p. 1161.) Such testimony might have bolstered Johnson's claim of innocence. But it would also have opened the door to Johnson's character, including his incessant abuse of alcohol, and as he acknowledges, his extensive list of arrests and convictions for crimes including robbery, multiple instances of domestic violence, battery, terrorist threats, and firearms charges. Indeed, Dr. Korpi's report noted no fewer than 18 arrests and convictions between 1980 and 2009.

Johnson maintains there was minimal risk that his criminal history would prejudice the jury against him because he testified at trial about two prior convictions, for making criminal threats and vandalism, and none of his priors involved sex crimes. But his attorney could reasonably have decided that the risks inherent in exposing the jury to Johnson's chronic alcoholism and extensive criminal history outweighed whatever value might be gained from expert testimony that he showed no obvious signs of pedophilia— particularly since the prosecution case did not rest on a theory that he was a pedophile, rather than an opportunistic offender. (See, e.g., *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1334–1335; compare *Stoll, supra,* 49 Cal.3d at p. 1161 [36 counts of lewd and

18

lascivious conduct against seven young children over a period of a year]; see *People v. Starr* (2003) 106 Cal.App.4th 1202, 1204, 1206 [pedophilia is a severe mental disorder that predisposes the defendant to engage in sex with minors].)  In context, competent counsel could very reasonably decide against pursuing a *Stoll* defense.

Johnson has not shown that his trial counsel's defense strategy was not based on valid and adequately informed tactical choices "within the range of reasonable competence." (*Pope, supra,* 23 Cal.3d at p. 425.)  Accordingly, we will not disturb the conviction.

## DISPOSITION

The judgment is affirmed.  The petition for a writ of habeas corpus is summarily denied.  (See *People v. Romero* (1994) 8 Cal.4th 728, 737.)

_____
Siggins, J.


We concur:


_____
Pollak, Acting P.J.


_____
Jenkins, J.

POLLAK, J., Concurring.—I believe that the analysis of the issues in the majority opinion is correct and therefore am compelled to concur in the disposition of this case. However, I must express my discomfort in doing so. The sentence of 35 years to life is simply not proportionate to the severity of what the jury found to be defendant's misconduct, even after considering his long history of prior offenses. The root of the problem, in my view, is the overbreadth of Penal Code section 288, subdivision (a), which imposes the same penalty on too broad a range of misconduct, coupled in this case with the mandatory enhancement under Penal Code section 667.61, subdivisions (b), (e)(4), because two victims were involved, and then doubled again under Penal Code section 1170.12, subdivision (c)(2) as a second strike. The prosecutor's willingness to recommend a three-year term if defendant pled to the offenses provides a better indication of an appropriate penalty for defendant's misconduct. The more than 13-fold increase resulting from defendant's exercise of his right to a jury trial compounds the reasons for questioning the wisdom of the result in this case.

_____

Pollak, Acting P.J.