Filed 11/19/13  P. v. Despois CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEREMY R. DESPOIS,<br><br>        Defendant and Appellant. | A134466<br><br>(Solano County<br>Super. Ct. No. FCR273646) |

Defendant Jeremy R. Despois appeals from his conviction of two counts of committing a lewd act on a child.  He maintains the trial court erred in excluding the testimony of a psychiatrist who would testify as an expert witness regarding questioning techniques and suggestibility of a child witness, and that it was error to deny his motion for new trial on the basis his counsel was ineffective.  We conclude there was no error, and affirm.

**PROCEDURAL AND FACTUAL BACKGROUND**

Defendant lived with K.J. and her children from 2008 through 2010.  The couple began living together in approximately May 2008.  The oldest child, M., was born in July 2004 and the youngest, in September 2009.  Defendant was not the father of the three older children.

In mid-2008, M., who was then four years old, asked her mother why "white stuff comes out of Jeremy's peepee."  When her mother asked M. to repeat what she said, M. responded " 'Never mind, mommy' " and walked away.  K.J. thought "I don't know; she's a child.  Maybe she's just saying things."

1

In the latter part of 2009, K.J. was feeding their newborn daughter and defendant said he would "go lay [the other children] down." He was in the children's bedroom for what seemed to K.J. an unusually long time. She had a "weird feeling" so she went to the children's room and opened the door. When she did so, she hit defendant with the door. He had been partially blocking the opening of the door, and was crouched down and "acting just a little funny." She noticed he was wearing "just his boxers and his shirt," but he had been wearing blue basketball shorts when he entered the room. M., who was then five years old, was lying in the bed drinking water. Water was spilling out of her mouth and she "looked a little red and upset" and "wouldn't talk."

A couple of weeks later, K.J. was putting her sons down for a nap in the bedroom. When she returned to the living room, she saw M. laying "over [defendant's] lap" and opening his pajama pants at the fly area. Once defendant noticed her, M. "jumped back in the fetal position and [defendant's] eyes were open wide [¶] . . . [¶] –like he was shocked." M. "didn't talk [and] . . . seemed scared." K.J. asked "What was going on?" Defendant responded " 'What the "F" do you think is going on?' " K.J. reached inside his pants to see if he had an erection, which he did not. She and defendant argued about what had happened.

"[P]robably later that day" K.J. "asked [M.] why she was laying in [defendant's] lap." M. did not respond, but "turn[ed] her head away and smil[ed]." K.J. had noticed that when M. lied, she "usually will turn her head away and smile. She wouldn't tell me anything." K.J. did not "know if it was just me or if it was what it was looking like."

A few days later, in January 2010, K.J. tried to talk to M. again. She said she had "noticed something," and asked M. if defendant "ever made her do anything." She used a "[c]alm, patient" tone of voice, and did not mention a penis, oral copulation, or any specifics. M., who was then five and a half years old, would not answer at first, but then asked if she was " 'going to get in trouble?' " K.J. responded "Baby, you are not going to get in trouble. Mommy is here. Mommy is going to protect you, and mommy will make anything stop if you just tell me." M. then told her mother defendant had done something

sexually inappropriate to her.[1]  On cross-examination, K.G testified M. told her defendant digitally penetrated her vagina, and forced her to perform oral sex on him "six, seven, maybe a thousand times."  K.J. told M. "what she is doing [i]s a good thing, and then I will make it stop, and it won't ever happen again."  K.J. wasn't sure what to do at that moment, because defendant was still there and she loved him.

Two days later, K.J. went to the police station.  A police officer came to her apartment and asked if they had any pornography, and she gave him permission to search.  Police conducted two interviews of M., neither of which were admitted in evidence.

A few weeks later, K.J. was talking to M. about going to see a therapist and explaining what a therapist was.  M. stated "out of the blue" that defendant " 'didn't put his peepee in my peepee or my butt, but he said when I get older, that we can do that whenever we want.' "

M. was six and a half years old and in the first grade at the time of her testimony in February 2011.  She could not identify defendant in the courtroom, but testified "Jeremy" had a tattoo of a sun on his right arm.  Police Officer Erwin Ramirez testified he had contacted defendant a year earlier, in February 2010.  At the time, defendant was not as thin as he was at the time of trial, and he had a tattoo of a sun and a joker on his right arm.

M. testified she told her mother defendant "stuck his private in my mouth."  He did it when they were on the couch and in the bed in their apartment.  M. first saw defendant's "private" when she went to get a drink of water and he "stuck it out of his pants."  When asked if she ever touched his private, M. testified "Only with my mouth."  The prosecutor asked why she touched his private with her mouth, and M. responded "he did that."  The prosecutor asked "[h]ow did he do that?" and M. explained "Um, he kept pushing my head back."  She "kept trying to . . . close [her] mouth, but he was too strong."  "[W]hite stuff" came out of his private.  M. "didn't like" the taste.

---

[1]  Pursuant to an in limine agreement, the prosecutor only elicited whether defendant had done something sexually inappropriate to M.

3

M. told her mother "the day after he last stopped." Her mother wanted M. to tell her. She did not tell her mother earlier because she "was too scared, [she] . . . will get sent to [her] room."

M. also testified she watched movies with defendant. They watched Farmland, Toy Story Two, and movies with people who had no clothes on. M. "kept moving around" when they were watching the movies with naked people, but defendant "just wanted [her] to watch. He kept pulling [her] on the couch." M. did not want to watch the movie because "[i]t was too disgusting." They watched movies with naked people "[l]ots."

Defendant testified he was in a relationship with K.J. for over a year and a half. He loved M. and viewed her as his daughter. Part of being her father involved "teach[ing] her how to be a young lady" because M. "would sit with her knees up kind of inappropriately or go to the bathroom with the door open, or with the boys being around, or her butt crack would hang out." He would tell her to "pull up [her] pants" and "sit with [her] legs closed."

Defendant explained M. walked in on him and K.J. when they were having sex on three occasions. One time, M. saw him ejaculate on K.J.'s stomach. Another time, he was "performing oral sex on [K.J.] when [M.] barged in." The third time, M. walked in on them when K.J. was performing oral sex on defendant. K.J. testified M. never walked in on her and defendant when they were engaged in sexual activity.

Defendant testified he did not digitally penetrate M.'s vagina, she did not perform oral sex on him, and he never watched pornography with her. He testified K.J. was lying about seeing him in only his boxer shorts in the children's bedroom.

## DISCUSSION

### Exclusion of Expert Testimony

Defendant maintains the trial court erred in excluding the testimony of his proposed expert witness, Dr. Lee Coleman, on false memory syndrome and child suggestiveness, denying him a fair trial.

4

Expert testimony is admissible if it is related to a subject sufficiently beyond common experience that it would assist the trier of fact. (*People v. Brown* (2004) 33 Cal.4th 892, 900; Evid. Code, § 801, subd. (a).) On the other hand, "[e]xpert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of facts as by the witness." (*People v. Torres* (1995) 33 Cal.App.4th 37, 45.) We review the trial court's decision on the admissibility of expert opinion testimony for abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 266.)

Defendant concedes there is no published California case addressing "the admissibility of expert testimony regarding the suggestibility of child witnesses and the forensic interviewing of children." California has a "judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony. [Citations.] California courts have viewed such examinations with disfavor because ' "[a] psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify the issues; the testimony may be distracting, time-consuming and costly." ' [Citation.]" (*People v. Alcala* (1992) 4 Cal.4th 742, 781–782.) In general, jurors are "considered to be equipped to judge witness credibility without the need for expert testimony." (*People v. Wells* (2004) 118 Cal.App.4th 179, 189.)

Other jurisdictions have taken differing approaches to this type of expert testimony. Some jurisdictions have admitted the expert testimony, reasoning "such testimony involves an area of expertise beyond the ken of the average layman and, therefore, that the defendant in a child molestation case is entitled to introduce expert testimony for the limited purpose of providing the jury with information about proper techniques for interviewing children and whether the interviewing techniques actually utilized were proper." (*Barlow v. State* (1998) 270 Ga. 54, 54 [507 S.E.2d 416, 417].)

5

Others have excluded it because "the subject matter was within the jurors' common knowledge and experience." (*People v. Johnston* (N.Y.A.D. 2000) 273 A.D.2d 514, 518; *State v. Ellis* (Me. 1996) 669 A.2d 752, 753–754 ["Defendant was entitled to explore the interviewing techniques that were used and to argue to the jury that they may have influenced the children's testimony. Defendant was not entitled to have his argument buttressed by the presentation of common knowledge in the form of an expert scientific opinion."].)

In this case, the prosecutor moved in limine to admit evidence of police interviews of M. under Evidence Code section 1237, and to exclude the testimony of Dr. Coleman, defendant's proposed expert witness. In a January 31, 2010 police interview, M. said she talked to her mother about defendant, but she did not remember. M. said she did not want to talk "[b]ecause I'm just shy and I'm scared to talk." She then began crying and saying she wanted her mother. A different police officer interviewed M. again the next day. M. told her defendant made her suck his private parts. When defendant did that, M. said "[t]he nasty stuff comes out. I don't ever want to taste it again."

The defense submitted an offer of proof regarding Dr. Coleman's proposed testimony, stating he would "testify that the manner in which a child is interviewed and counseled can affect whether a memory is true. [¶] . . . Specifically, he will testify that the manner in which a child is questioned can cause them to lose the ability to distinguish between what they know to be a memory and what events have actually taken place. He is prepared to testify that the manner in which all the parties (the parent of the complaining witness, law enforcement, and clinical interviewers) can affect a child and potentially cause false memories. [¶] . . . [¶] . . . Dr. Coleman is prepared to testify that the manner in which the MDIC [Multi-Disciplinary Interview Center] interview was conducted was substandard for various reasons [¶] . . . [and] is prepared to testify that a false memory can inadvertently be planted in a child's head in a single conversation, even without an[] intent to do so; specifically, the mother's concerns about possible abuse prior to the last incident. Moreover, the mother's tone and form of questions can affect the ability of the alleged victim to properly recall history."

6

Prior to trial, the court stated "Here are my thoughts concerning Dr. Coleman: I believe that should the [police interview] become relevant and come in, . . . then his testimony would be relevant, and I would allow it, because as I read the affidavits[2] submitted by defense, and my understanding of his expertise, much of it dealt with how questions were asked of minors; so if that becomes an issue, which, in the [police interview] I would allow him to testify. [¶] If the alleged victim testifies and . . . the [police interview] and/or the questioning does not become an issue, then I don't see how it would become relevant." The court indicated it would "revisit this" after M. testified.

After the prosecution rested without introducing evidence of the police interviews of M., the defense sought to have Dr. Coleman testify "to childhood development, memory suggestibility, and potential impact of questioning techniques on the child's memory in general; testify to the somewhat fluid nature of a minor's perception of history and the effect that suggestive questioning, et cetera, can have on a minor; specifically, that a false memory can be planted in the matter of a single conversation, even in the absence of an intent on the part of the planter. [¶] The second part that I think is relevant is that he has reviewed the various interviews in this case, including the original officer's interview, the MDIC, the interview that I did conduct myself and the investigator, as well as police reports. He would testify that the manner in which the questioning took place in this case are of the nature which could lead to a false memory implant being planted."

The court stated "the Court's initial ruling on this discussion was one of whether . . . if we got to the MDIC and if there [were] questions concerning the methodology of the questioning, I would give a tentative ruling of leaning towards allowing Dr. Coleman to testify. [¶] And [defense counsel] is correct in that the testimony, the mere fact that an MDIC was not introduced into evidence is not a per se bar to the testimony of Dr. Coleman as an expert. [¶] Again, these are . . . relevant, and then does it pass the 352 test? . . . [¶] When I review the testimony and the evidence before the Court, that is, the testimony of the mother . . . concerning her observations of what was occurring in her

---

**2** The defense submitted an offer of proof in the form of a memorandum regarding Dr. Coleman's testimony, not his affidavit or C.V.

7

opinion with her daughter, and her pressing and questioning of what happened to her daughter, I note in the testimony that . . . [the questions were] all sort of what happened, and there was very little leading. [¶] There were very little questions that would lead to any sort of creating of a false memory. [¶] In other words, . . . there wasn't the type of questions of . . . 'isn't it true Jeremy did X, Y, Z to you?' With the child parroting back, 'Yes, he did X, Y, Z to me." [¶] They were very much open-ended questions, and although there was a refusal often to answer the questions, I didn't sense that any of the issues that Dr. Coleman would testify would be very relevant. I think they would be relevant. [¶] However, when I balance that under 352 of undue . . . delay, unnecessary confusion . . . in light of the state of the evidence, I am going to deny your request to call Dr. Coleman . . . ."[3]

The court found Dr. Coleman's testimony relevant, but not "very relevant," given the lack of evidence of any suggestive questioning. The court properly weighed the limited relevance of Dr. Coleman's proposed testimony against the undue delay and confusion his proposed testimony would cause. There was no abuse of discretion in excluding the proposed expert testimony under Evidence Code section 352.

Neither did exclusion of the proposed testimony deprive defendant of his constitutional right to due process or to present a defense. " ' "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." ' " (*People v. Gurule* (2002) 28 Cal.4th 557, 620.) Defendant had the opportunity to have Dr. Coleman testify if he chose to introduce M.'s police interviews, which he ultimately did not. He also had the opportunity to cross-examine M. and her mother about the claimed suggestive questioning and M.'s memory issues, and to argue his theory of "implanted" false memory to the jury. Accordingly, he was not denied his right to present a defense.

---

[3] Defense counsel then sought to introduce the videotape of an initial police interview of M., in which she stated she did not remember and would not answer questions, as a prior inconsistent statement of the victim. The court allowed it, but the following morning, defense counsel indicated "after giving the matter considerable thought, I'm not going to be introducing [the interview videotape] at this time."

8

*Denial of Motion for New Trial*

Defendant also contends the court erred in denying his motion for new trial on the basis his counsel was ineffective. He asserts counsel failed to have his family and friends testify as character witnesses, promised in opening argument he would present the testimony of Dr. Coleman regarding suggestive questioning techniques, but then failed to make an adequate argument for the admission of Dr. Coleman's testimony, and failed to investigate and introduce favorable psychological evidence under *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*).[4]

In order to demonstrate ineffective assistance of counsel, " 'a defendant must show that counsel's performance was inadequate when measured against the standard of a reasonably competent attorney, and that counsel's performance prejudiced defendant's case in such a manner that his representation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686. . . .)' " (*People v. Brodit* (1998) 61 Cal.App.4th 1312, 1333.) " 'In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny [citation]'. . . . 'Although deference is not abdication . . . courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' " (*Id.* at p. 1335, quoting *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

---

[4] In *Stoll*, the court held "[e]xpert opinion that defendants show no obvious psychological or sexual problems is circumstantial evidence which bears upon whether they committed sexual acts upon children, and is admissible 'character' evidence on their behalf." (*Stoll, supra*, 49 Cal.3d at p. 1161.) Defendant notes the Penal Code section 288.1 psychological evaluation by Dr. Nakagawa, for which he refused to answer any questions about the charges, demonstrated his response to questioning was different from others subject to section 288.1 assessments in that he gave "well-elaborated and often spontaneous responses regarding psychosexual matters." Given that defendant refused to discuss the charges, however, Dr. Nakagawa concluded "With respect to the defendant being predisposed to commission of a sexual offense no opinion can be offered even though the data obtained in the present assessment indicated no notable indication of sexual preoccupation or aberration."

"Defendant's burden is difficult to carry on direct appeal.  We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission." (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1148.)  " 'In some cases, . . . the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged.  In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal. [Citation.]' " (*People v. Avena* (1996) 13 Cal.4th 394, 418–419, italics omitted.)  " 'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.)  When defense counsel's reasons are not readily apparent from the record, we will not assume he or she was ineffective unless the challenged conduct could have had no conceivable tactical purpose. (*People v. Dickey* (2005) 35 Cal.4th 884, 926–927.)

Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, " ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

Defendant claims the court "found trial counsel had been deficient."  In denying the motion for new trial, the trial court[5] stated, "I am not sure I would say this is the worst case I have ever seen from a defense perspective in terms of trial.  But it wasn't real competent."  The court, however, held it was the "second level that is a very difficult task for a defense counsel to reach.  And I don't think that IAC rises to that level where I can say it would be a different result."

Even if defendant's counsel was ineffective in some respects, we likewise conclude there was not a reasonable probability that but for trial counsel's claimed deficiencies, the result would have been more favorable to defendant.

---

[5] The Honorable Gregory Caskey was appointed by the Chief Justice to hear the new trial motion after the trial judge disqualified himself.

The evidence showed M. made two spontaneous statements to her mother implicating defendant. In the first one, in mid-2008, M. asked K.J. why "white stuff comes out of Jeremy's peepee." M. made this statement before either her mother or police had asked her any questions about sexual abuse. M. also told her mother "out of the blue" that defendant " 'didn't put his peepee in my peepee or my butt, but he said when I get older, that we can do that whenever we want.' "

Additionally, M. testified in a manner consistent with a young child inexperienced in sexual matters prior to her contact with defendant. She told her mother defendant "stuck his private in my mouth." She did not tell her mother before because she was afraid she would be sent to her room. M. explained defendant put his penis in her mouth when they were on the couch and in the bed in their apartment. When asked if she ever touched his private, M. testified "Only with my mouth." The prosecutor asked why she touched his private with her mouth, and M. responded "he did that." The prosecutor asked "[h]ow did he do that?" and M. explained "Um, he kept pushing my head back." She "kept trying to . . . close [her] mouth, but he was too strong." "[W]hite stuff" came out of his private. M. "didn't like" the taste. Though defendant attempted to establish M.'s prior knowledge of sexual acts by testifying M. walked in on him and her mother when they were engaged in giving and receiving oral sex and when he was ejaculating on her stomach, M.'s mother testified M. never walked in on them during sexual activity.

Furthermore, M.'s mother testified not only about M.'s fresh complaint of abuse to her and M.'s spontaneous declarations, but also about her own observations. She observed defendant coming out of the children's bedroom wearing only his boxers when he had worn basketball shorts going in, and M. sitting up in bed with a red face and not speaking. She also observed M. lying over defendant on the sofa and opening the fly of his pants. Defendant became angry when she asked what was going on.

Defendant denied the conduct to which M. and her mother testified. Much of his own testimony, however, undermined his credibility. For instance, he testified the five-year-old behaved sexually inappropriately, and that he had to teach her the correct way to behave as a "young lady."

11

Defendant maintains the prejudice to him is evidenced by the fact the judge hearing his new trial motion "found his claims of innocence 'not unreasonable.' " This misrepresents the record. The trial court, at sentencing, stated the defense attorney's "position is not unreasonable." The defense attorney's position was that the court should impose probation rather than a prison term, based on the defendant's lack of prior convictions, character evidence presented by his family at sentencing, and unlikelihood of further contact with M. given that she had moved out of state. In denying probation, the court explained: "I've had much more serious, long continuous sexual abuse [cases], horrible things, this is not that bad. . . . But it's more than just a touching, more than a fondling. When you force a four year old to, uh, orally copulate and you ejaculate, that's just very disturbing."

Given the evidence before the jury, it is not reasonably probable the result would have been more favorable to defendant had his attorney introduced character evidence submitted by his family and friends, Dr. Coleman's proposed testimony about potentially suggestive questioning, or a *Stoll* assessment indicating defendant's personality profile was not consistent with that of a child molester.

## DISPOSITION

The judgment is affirmed.

 

_____

Banke, J.

We concur:

_____

Margulies, Acting P. J.

_____

Dondero, J.

12